FOURTH DIVISION
April 15, 2010

Nos. 1-09-1619 & 1-09-1622 (Consolidated)

DOLJIN CHULTEM, Individually and on Behalf
of All Others Similarly Situated,

      Plaintiffs-Appellants,

v.

TICOR TITLE INSURANCE COMPANY,
CHICAGO TITLE AND TRUST COMPANY,
and FIDELITY NATIONAL FINANCIAL,
INC.,

      Defendants-Appellees.

PAUL A. COLELLA, Individually, and on
Behalf of All Others Similarly Situated,

      Plaintiffs-Appellants,

v.

CHICAGO TITLE INSURANCE COMPANY and
CHICAGO TITLE AND TRUST COMPANY,

      Defendants-Appellees.

Appeal from the
Circuit Court of
Cook County.

Nos.   06 CH 9488
        06 CH 9489

Honorable
Peter Flynn,
Judge Presiding.

JUSTICE O'BRIEN delivered the opinion of the court:

This consolidated appeal involves two cases filed as class actions. In each case, the

plaintiff sued the defendants for their alleged breaches of the Title Insurance Act (Title Act)(215

ILCS 155/1 (West 2002) (incorporating the Real Estate Settlement Procedures Act (RESPA), 12

U.S.C.§2607 (2000))), and the Consumer Fraud and Deceptive Business Practices Act

(Consumer Fraud Act) 815 ILCS 505/1 et seq. (West 2002)). The circuit court denied plaintiffs'

Nos. 1-09-1619 & 1-09-1622 (Consolidated)

motions for class certification. We granted leave to appeal pursuant to Supreme Court Rule 306(a)(8) (210 Ill. 2d R. 306(a)(8)). For the reasons that follow, we reverse and remand with instructions that the circuit court certify these cases as class actions.

In order to clearly set forth the issues in this case, we begin with a background discussion of the RESPA and the Title Act.

I. The Statutory and Regulatory Framework Governing the Illinois Title Insurance Industry

The Title Act (incorporating RESPA) governs the title insurance industry in Illinois. RESPA was enacted in 1974 to provide consumers "greater and more timely information on the nature and costs of the [real estate] settlement process" and to protect consumers from "unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C. §2601(a)(2000). Consistent with that goal, RESPA sections 8(a) and (b) prohibit persons from giving or receiving kickbacks for the referral of title insurance business and from giving or receiving a portion of any title insurance premium "other than for services actually performed." 12 U.S.C. §§2607(a), (b) (2000).

RESPA provides two limited exemptions to the prohibition against kickbacks in section 8. First, RESPA section 8(c)(1)(B) provides "[n]othing in this section shall be construed" as prohibiting a title insurance company from paying its agents "for services actually performed in the issuance of a policy of title insurance." 12 U.S.C. §2607(c)(1)(B) (2000). Second, RESPA section 8(c)(2) provides "[n]othing in this section shall be construed" as prohibiting "the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. §2607(c)(2) (2000).

Nos. 1-09-1619 & 1-09-1622 (Consolidated)

A. The Section 8(c)(1)(B) Exemption

The section 8(c)(1)(B) exemption (which allows for title insurance companies to pay their agents for services actually performed in the issuance of a title insurance policy) only applies in situations where an attorney agent performs "core title agent services." The federal agency charged with administering RESPA, the Department of Housing and Urban Development (HUD), issued regulations explaining RESPA section 8(c)(1)(B):

> "[F]or an attorney of the buyer or seller to receive compensation as a title agent, the attorney must perform core title agent services (for which liability arises) separate from attorney services, including the evaluation of the title search to determine the insurability of the title, the clearance of underwriting objections, the actual issuance of the policy or policies on behalf of the title insurance company, and, where customary, issuance of the title commitment, and the conducting of the title search and closing." 24 C.F.R. §3500.14(g)(3)(2001).

HUD has further stated:

> "HUD also will not consider a title insurance agent to be an agent for purposes of section 8(c)(1)(B) and to have actually performed (or incurred liability for) core title services when the service is undertaken in whole or in part by the agent's insurance company (or an affiliate of the insurance company). For example, if the title insurance company provides its title insurance agent with a pro forma commitment, typing, or other document preparation services, the title insurance agent is not 'actually performing' these services. As such, the title insurance agent would not be providing 'core title services' for

-3-

Nos. 1-09-1619 & 1-09-1622 (Consolidated)

the payments to come within the section 8(c)(1)(B) exemption." RESPA Statement of Policy 1996-4, 61 Fed. Reg. 49398, 49400 (eff. September 19, 1996).

HUD defines "pro forma commitment" as:

"[A] document that contains a determination of the insurability of the title upon which a title insurance commitment or policy may be based and that contains essentially the information stated in Schedule A and B of a title insurance commitment (and may legally constitute a commitment when countersigned by an authorized representative). A pro forma commitment is a document that contains determinations or conclusions that are the product of legal or underwriting judgment regarding the operation or effect of the various documents or instruments or how they affect the title, or what matters constitute defects in title, or how the defects can be removed, or instructions concerning what items to include and/or to exclude in any title commitment or policy to be issued on behalf of the underwriter." RESPA Statement of Policy 1996-4, 61 Fed. Reg. 49399 (eff. September 19, 1996).

B. The Section 8(c)(2) Exemption

As discussed above, RESPA section 8(c)(2) provides "[n]othing in this section shall be construed" as prohibiting "the payment to any person of a bona fide salary or compensation or other payments for goods or facilities actually furnished or for services actually performed." 12 U.S.C. §2607(c)(2) (2000). HUD's enforcement position is:

"[I]t is difficult to justify the payment (or retention) of a significant portion of the title insurance risk premium to a title insurance agent who fails to perform and assume

-4-

responsibility for the title examination function. Likewise, if the title insurance company provides other services, or carries out the title insurance agent functions, or provides or controls 'part time examiners,' <u>HUD may scrutinize the net level of retention realized by the agent to determine whether the agent's compensation from the insurer reflects a meaningful reduction from the compensation generally paid to agents in the area who perform all core title services. The level of such reduction in compensation must be reasonably commensurate with the reduced level of responsibilities assumed by such person for the services provided and the underwriting risks taken</u>." (Emphasis added.) RESPA, Statement of Policy 1996-4, 61 Fed. Reg. 49400 (eff. September 19, 1996).

Plaintiffs contend the emphasized portion of the HUD policy statement indicates defendants cannot pay full contract compensation to their attorney agents for anything less than core title services. When the attorney agents perform anything less than core title services, the compensation must be reduced to reflect their reduced level of responsibilities.

II. Doljin Chultem's Cause of Action

In plaintiff Doljin Chultem's third-amended complaint, she pleaded that on August 31, 2005, she purchased certain real property in Illinois. That sale included the purchase of a title insurance policy from defendants Ticor Title Insurance Company (TTI), Chicago Title and Trust Company, and Fidelity National Financial, Inc. TTI is a wholly owned subsidiary of Chicago Title and Trust Company. Chicago Title and Trust Company is a subsidiary of Fidelity National Financial, Inc.

Ms. Chultem pleaded that title insurance policies are issued by the title insurance

companies directly through their employees or by agents of such companies (title agents). Some title insurance companies, including defendants, utilize as title agents attorneys who also represent one or more parties to the real estate transaction. These title insurance companies, including defendants, compensate these "attorney agents" over and above the attorney fees paid by the attorneys' clients, the parties to the real estate transaction.

Ms. Chultem pleaded that Illinois and federal law, which disallow the payment of kickbacks and unearned fees, prohibit title insurance companies from paying attorneys merely for the referral of business to the title insurance company. If the title insurance company compensates a title insurance agent, including an attorney agent, without requiring the attorney agent to perform all the necessary title insurance agent services, then the payment is a kickback or unearned fee. If a title insurance company pays a title insurance agent from the proceeds of the title insurance policy premium, the title insurance company is required by Illinois and federal law to prepare the title insurance commitment based exclusively on the attorney agent's examination of title and determination of title insurability. If a title insurance company examines title and prepares a preliminary or pro forma title commitment not based exclusively on the attorney agent's determination of title insurability, it has violated Illinois and federal law.

Ms. Chultem pleaded that defendants have developed attorney agent programs designed to compensate attorney agents in exchange for the referral of business. Under such attorney agent programs, title insurance transactions are conducted in accordance with standard procedures created and implemented by defendants. In violation of Illinois and federal law, defendants pay their attorney agents based solely on the amount of title insurance premiums

generated from the referred clients and without regard to the time spent by the attorney agents or the quality and quantity of services performed by the attorney agents. Attorney agents in these programs receive a predetermined percentage of the title insurance premium pursuant to a fee schedule. These payments typically range from approximately 70% to 80% of the premium collected, depending upon the time period, and at all times exceed 50% of the premium collected.

Ms. Chultem pleaded that pursuant to the attorney agent program and in violation of Illinois and federal law, defendants perform the very services that are legally required to be performed by the attorney agents. Specifically, defendants, independent of the attorney agents, examine title and determine insurability of title, clear underwriting objections (by waiving exceptions to title commitments or policies), issue title commitments and policies, and conduct the title searches and closings. Defendants' performance of these services necessarily renders all payments to attorney agents through these programs mere kickbacks in violation of Illinois and federal law.

Ms. Chultem pleaded that as part of its attorney agent programs and in violation of Illinois and federal law, defendants examine title and prepare preliminary or pro forma title commitments not based exclusively on the attorney agent's determination of title insurability. From at least early 2000 through September 2005, defendant TTI provided an "A-exam" to attorney agents, which incorporated in the form of a preliminary title commitment all of the information in TTI's electronic database relating to the property being bought and sold. In 2005, the A-exam was replaced by a different document called an attorney agent examination worksheet, but which still contained the same information in the form of a preliminary or pro

forma title commitment.

Count I pleaded violations of the Title Act and RESPA. Count II pleaded violations of the Consumer Fraud Act. Count III sought injunctive relief. Ms. Chultem also sought to bring the action as a class action on behalf of all people who purchased, sold or mortgaged real property in Illinois and who paid for a title insurance policy from one or more defendants, any part of which premium then was shared with an attorney pursuant to defendants' attorney agent program.

III. Paul Colella's Cause of Action

Mr. Colella pleaded in his third-amended complaint that on July 20, 2005, he purchased certain real property in Illinois. That sale included the purchase of a title insurance policy from defendants Chicago Title Insurance Company (CTI), Chicago Title and Trust Company, and Fidelity National Financial, Inc.

Similar to Ms. Chultem's complaint, Mr. Colella pleaded that defendants developed attorney agent programs that violated Illinois and federal law by paying the attorney agents based solely on the amount of title insurance premiums generated from the referred clients and without regard to the quality or quantity of services actually performed by the attorney agents. The attorney agents in these programs receive a predetermined percentage of the title insurance premium pursuant to a fee schedule. These payments typically range from approximately 70% to 80% of the premium collected.

Similar to Ms. Chultem's complaint, Mr. Colella pleaded that pursuant to the attorney agent program and in violation of Illinois and federal law, defendants perform the very services

that are legally required to be performed by the attorney agents.  Specifically, defendants, independent of the attorney agents, examine title and determine insurability of title, clear underwriting objections, issue title commitments and policies, and conduct the title searches and closings.

Mr. Colella pleaded that as part of its attorney agent programs and in violation of Illinois and federal law, defendants examine title and prepare preliminary or pro forma title commitments not based exclusively on the attorney agent's determination of title insurability. From the inception of its attorney agent program in 1997 until 2001, CTI's Metro Northwest Region sent attorney agents a title search package that included a "Title Examination" in the form of a title commitment.  From 2001 through September 2005, CTI sent a preliminary title commitment with the title search package to attorney agents in the Metro Northwest Region. From September 2005 through April 2006, CTI sent the title search package,  already prepared in the form of a title commitment, to Metro Northwest attorney agents.

Mr. Colella pleaded that from 1999 through the late summer of 2005, CTI's Southwest Metro Region provided a preliminary title commitment to attorney agents along with the search package.  From the inception of its attorney agent programs until at least April 2006, CTI also sent preliminary title commitments to its attorney agents throughout other parts of Illinois.

Mr. Colella pleaded that from the inception of its attorney agent programs in 1997 through the present, CTI trained employees to examine title and determine insurability, the very tasks defendants must require of their attorney agents in order to lawfully compensate these agents from the proceeds of title insurance policy premiums.  CTI makes the decisions whether to

release or insure over any exceptions to the title insurance commitment, which is an essential part of the title insurance agents' function. Defendants' performance of these services necessarily renders all payments to attorney agents through these programs mere kickbacks in violation of Illinois and federal law.

Count I pleaded violations of the Title Act and RESPA. Count II pleaded violations of the Consumer Fraud Act. Count III sought injunctive relief. Mr. Colella also sought to bring the action as a class action on behalf of all people who purchased, sold or mortgaged real property in Illinois and who paid for a title insurance policy from one or more defendants, any part of which premium then was shared with an attorney pursuant to defendants' attorney agent program.

IV. Procedural History

On November 13, 2007, plaintiffs moved to certify the two cases as class actions pursuant to section 2-801 of the Code of Civil Procedure (735 ILCS 5/2-801 (West 2006)). Following a hearing on February 22, 2008, the circuit court denied plaintiffs' motion without prejudice, finding "one would not be able to tell whether a given transaction was illegal without looking at that transaction which means liability couldn't be determined across the board."

On September 12, 2008, plaintiffs filed separate renewed motions for class certification (the second motions). Plaintiffs' proposed new class definitions in each case were as follows:

"All persons who bought, sold or mortgaged residential real property within the State of Illinois and who paid for title insurance from Defendants where any part of the premium for the title insurance was then shared by Defendants with their attorney agents pursuant to Defendants' attorney agent programs if:

1. Defendants' transaction file contains no attorney agent title examination; or,

2. the preparation date of the first title insurance commitment prepared for the transaction precedes the date of the attorney agent's title examination; or

3. the following are true when comparing Defendants' title search results (title search package, title examination, A-exam, pre-commitment, pre-examination, or other 'pro-forma commitment') with the first title insurance commitment prepared in the transaction:

> a) the name of the proposed insured owner does not change;
>
> b) the name of the record owner does not change;
>
> c) the legal description of the real estate does not change;
>
> d) the title exceptions do not change; and
>
> e) the tax identification number does not change."

In their briefs in opposition to plaintiffs' second motions for certification, all defendants argued: (1) individual issues predominated, because each real estate transaction would have to be examined to determine whether the attorney agent rendered compensable services; and (2) the proposed class was not ascertainable, because the process of reviewing defendants' transaction files to determine class membership would be burdensome.

Following additional discovery, plaintiffs tailored new class definitions to fit the circumstances of each case and proposed them in their replies in support of the second motions. In the Chultem action, the proposed class was defined as:

"All persons who bought, sold or mortgaged residential real property involving a federally related mortgage loan within the State of Illinois and who paid for title insurance from Ticor Title Insurance Co. from February 1, 2000 to September 30, 2005, in a transaction where Ticor Title Insurance Co.'s records reflect:

(A) The A-Exam returned by the attorney agent contains no changes or additions to the information transmitted by Ticor Title Insurance Co. to the attorney agent, and

(B) Ticor Title Insurance Co. paid the attorney agent the full amount of compensation due under the operative agency agreement or contract with such attorney agent."

In the Colella action, the proposed class was defined as:

"All persons who bought, sold or mortgaged residential real property involving a federally related mortgage loan within the State of Illinois and who paid for title insurance from Chicago Title Insurance Co. from January 1, 2001 to September 1, 2005, in a transaction where Chicago Title Insurance Co.'s records reflect that the attorney agent was paid the full amount of compensation due under the operative agency agreement or contract with such attorney agent."

On May 26, 2009, the circuit court denied both motions for class certification. On June 22, 2009, the circuit court entered another order, on plaintiffs' unopposed motion, amending the second motions for class certification to conform to the class definitions proposed in plaintiffs' reply briefs. This permissive appeal followed.

Nos. 1-09-1619 & 1-09-1622 (Consolidated)

V. Analysis

Section 2-801 of the Code of Civil Procedure (735 ILCS 5/2-801 (West 2006)) governs class certification. Pursuant to section 2-801, the court may certify a class only if plaintiffs establish the following:

"(1) The class is so numerous that joinder of all members is impracticable.

(2) There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.

(3) The representative parties will fairly and adequately protect the interest of the class.

(4) The class action is an appropriate method for the fair and efficient adjudication of the controversy." 735 ILCS 5/2-801 (West 2006).

In determining whether the proposed class should be certified, the court accepts the allegations of the complaint as true. Ramirez v. Midway Moving & Storage, Inc., 378 Ill. App. 3d 51, 53 (2007). The circuit court has broad discretion in determining whether a proposed class meets the requirements for class certification and should err in favor of maintaining class certification. Ramirez, 378 Ill. App. 3d at 53. Decisions regarding class certification will be overturned only when the court clearly abused its discretion or applied impermissible legal criteria. Avery v. State Farm Mutual Automobile Insurance Co., 216 Ill. 2d 100, 125-26 (2005).

In the present case, neither party disputes plaintiffs' proposed classes satisfy the numerosity and adequacy of representation requirements of section 2-801. The issue is whether plaintiffs' proposed classes in their second-amended motions for class certification meet section

-13-

2-801's "predominance" requirement that common questions predominate over any questions involving only individual members.

Defendants argue that in determining whether they violated RESPA by providing kickbacks to attorney agents for referral of title insurance business, the trier of fact necessarily will have to examine whether either the section 8(c)(1)(B) exemption or section 8(c)(2) exemption applies. Under section 8(c)(1)(B), the trier of fact must determine what work the attorney agent performed in conjunction with each transaction and whether that work comprised "core title services" for which he is entitled to full contract compensation. For any transaction where the attorney agent did not perform core title services, the trier of fact then must proceed, under the section 8(c)(2) exemption, to assess the services performed and weigh the reasonable value of those services to determine the level of compensation due. Defendants contend since liability turns on a transaction-by-transaction review of whether the attorney agent performed core title services or received payment for services actually performed, common issues do not predominate over individualized ones as required for class certification under section 2-801.

Defendants' arguments are unavailing. The allegations in plaintiffs' complaint, taken as true for purposes of determining class certification, are that Ticor's A-exam and CTI's preliminary commitment are "pro forma commitments" and, as such, any attorney agent would not be providing "core title services" for the payments to come within the section 8(c)(1)(B) exemption. See RESPA Statement of Policy 1996-4, 61 Fed Reg. 49400 (eff. September 19, 1996) ("if the title insurance company provides its title insurance agent with a pro forma commitment *** the title insurance agent is not 'actually performing' these services. As such, the

title insurance agent would not be providing 'core title services' for the payments to come within the section 8(c)(1)(B) exemption"). Further, both of plaintiffs' proposed classes contain only those attorney agents who were paid the full amount due under the applicable attorney agent contract; plaintiffs contend the section 8(c)(2) exemption is not applicable here since said exemption only applies when the attorney agent is paid less than the full contract rate for the performance of something other than core title services. See RESPA, Statement of Policy 1996-4, 61 Fed. Reg. 49400 (eff. September 19, 1996). Plaintiffs contend since the defendants paid their attorney agents the full contract rate, said payments do not fall within the section 8(c)(2) exemption.

Defendants dispute plaintiffs' contention they provided pro forma commitments to their attorney agents, and it was unlawful for them to pay their attorney agents the full contract rate pursuant thereto. However, these are questions common to the class that predominate over any individual issues. Specifically, if the plaintiffs are able to prove at trial Ticor's A-exam and CTI's preliminary commitments are "pro forma commitments" and defendants cannot lawfully send their attorney agents pro forma commitments and pay them full compensation, they will prevail on their individual claims and will have established a right to recovery for all class members regardless of the services performed by said attorney agents. In other words, a finding that Ticor's A-exam and CTI's preliminary commitments are "pro forma commitments," and, it was unlawful for defendants to pay their attorney agents the full amount due under the applicable attorney agent contract, necessarily means neither the section 8(c)(1)(B) nor the section 8(c)(2) exemption applies; therefore, the trier of fact will not have to make a transaction-by-transaction

review of whether the attorney agents performed core title services pursuant to the section 8(c)(1)(B) exemption or whether the attorney agents performed lesser services pursuant to the section 8(c)(2) exemption. Instead, as discussed, plaintiffs will have established a right to recovery for all class members and all that will remain is an administrative determination of damages. Accordingly, plaintiffs have satisfied the predominance requirement of section 2-801.

Defendants note, in assessing whether issues common to the class predominate over individual issues, the court may look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law. See Smith v. Illinois Central R.R. Co., 223 Ill. 2d 441, 449 (2006). Accordingly, defendants ask this court to look beyond the pleadings to the testimony of various attorney agents and to the language of the CTI Title Search Packages, which informed the attorney agents it was their responsibility to determine insurability of title. These attorney agents testified that they conducted independent examinations of title and drew their own conclusions thereto. Defendants contend this evidence showed individual attorney agents performed core title services and determined insurability of title. Therefore, defendants argue there is no way to impose liability on defendants without a transaction-by-transaction examination of the work performed by the attorney agents, to determine whether and to what extent core title services were performed.

Defendants' argument is unavailing. As discussed above, if the defendants in fact were sending their attorney agents pro forma commitments, then under the HUD regulatory materials the attorney agents were not performing core title services for the payments to come within the section 8(c)(1)(B) exemption. The questions of whether the defendants were sending their

attorney agents pro forma commitments, and whether the defendants lawfully can pay their attorney agents full contract compensation after sending them pro forma commitments, are questions common to the respective classes which, if resolved in favor of plaintiffs, will settle the entire controversy. See Smith, 223 Ill. 2d at 449 (where the predominance test is met, a judgment in favor of the class members settles the entire controversy, and all that remains is for the other class members to file proof of their claim). Contrary to defendants' argument, a transaction-by-transaction examination of the work performed by the attorney agents is not necessary to a resolution of these questions.

Next, the parties each make rather cursory arguments concerning the level of deference the circuit court should have given to the HUD regulatory materials. Plaintiffs indicate the circuit court should have deferred to the HUD regulatory materials that provided defendants cannot pay full compensation to their attorney agents for reexamining pro forma commitments; defendants argue such deference was not required. This issue goes to the merits of the underlying actions and is not appropriate to be considered when examining the propriety of class certification. See Cruz v. Unilock Chicago, Inc., 383 Ill. App. 3d 752, 764 (2008) (the trial court's discretion is limited to an inquiry into whether the plaintiffs are asserting a claim which, assuming its merits, will satisfy the requirements of section 2-801 as distinguished from an inquiry into the merits of the plaintiffs' particular individual claims).

Next, defendants argue a federal district judge denied class certification in a case involving similar facts and claims. See Howland v. First American Title Insurance Co., No. 07 C 2628 (N.D. Ill. 2009). Defendants contend Howland compels a result different than the one

reached here. We disagree, as the district judge in <u>Howland</u> never discussed the issue as it is presented here, <u>i.e.</u>, whether the predominance requirement is satisfied where the plaintiffs allege the title insurance companies paid the attorney agents in full after sending them <u>pro</u> <u>forma</u> commitments.

On the pleadings and facts of the present case, the plaintiffs have satisfied all the class certification requirements of section 2-801, making it evident a class action is appropriate. As plaintiffs have met all the requirements of section 2-801, including the predominance requirement, we reverse and remand with instructions the circuit court certify these cases as class actions.

As a result of our disposition of this case, we need not address the other arguments on appeal.

Reversed and remanded with instructions.

GALLAGHER and NEVILLE, JJ.'s concur.