In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-1816 & 11-1817

JANICE M. HOWLAND and SCOTT TEGTMEYER,
individually and on behalf of
all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

FIRST AMERICAN TITLE INSURANCE COMPANY,

*Defendant-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 2628—**Ronald A. Guzman**, *Judge.*

ARGUED OCTOBER 24, 2011—DECIDED MARCH 6, 2012

Before SYKES and TINDER, *Circuit Judges*, and DEGUILIO,
*District Judge.*[*]

DEGUILIO, *District Judge.* First American Title Insurance
Company sells title insurance to consumers in Illinois

[*] Of the United States District Court for the Northern District
of Indiana, sitting by designation.

through its attorney title agent program, in which it pays the consumer's real estate attorney to conduct a title examination and determine whether the title is insurable. Plaintiffs contend that the payment is designed to compensate for referrals, not actual services, and that First American's program violates Section 8 of the Real Estate Settlement Procedures Act ("RESPA"), which prohibits kickbacks and fee splitting. The district court twice denied class certification under Federal Rule of Civil Procedure Rule 23(b)(3), concluding that an individual determination of liability would be required for each class member. We agree. Class actions are rare in RESPA Section 8 cases, and this is no exception.

I.

Title insurance protects real estate buyers and lenders against losses caused by defects in a property's title. Consumers can purchase title insurance directly from a title insurance company, but generally they purchase it from a real estate professional acting as a "title agent" for the insurer. In Illinois, where attorneys typically represent consumers in real estate transactions, those attorneys often also serve as title agents for title insurance companies.

First American sells title insurance both directly to consumers and through attorney title agents. It also maintains a "title plant" database containing up-to-date copies of recorded documents and public records. When a title insurance purchase is made directly from First American, in-house attorneys get title search materials

from the title plant, examine those materials, and determine whether the title is insurable.

When an attorney agent sells the policy, however, First American contracts with that attorney, rather than its in-house attorneys, to conduct a title examination and determine insurability. Until September 2005 (when the class-definition cuts off), First American would provide its attorney agents with a search package containing raw data from the title plant about the property and parties and a "search summary sheet" that summarized parts of the data and listed essential information, such as the legal description of the property, the last known grantee on the most current deed, and open liens. It also listed any potential issues with the title readily identified (without additional examination or research) by a computer or First American employee. The attorney agent would then conduct his title examination; according to the agency contract, this required examining the information that First American provided as well as any other relevant information that might caution against insuring the title. And although the agency contract authorized the agent only to conduct a title examination on First American's behalf, agents sometimes performed other services, including providing documentation to clear exceptions in the policy and waiving exceptions on First American's behalf and assuming liability for the waiver.

Based on the examination, the agent would make any necessary additions, deletions, or changes to the search summary sheet. If the information in the summary was

correct and complete, however, the agent would make no changes. The agent would then sign the search summary sheet, indicating his approval. First American next prepared a title insurance commitment based on the information in the returned search summary sheet, which was then approved by the agent and distributed to the parties.

On May 9, 2007, Douglas Sharbaugh filed this suit against First American, claiming that the practices outlined above constitute an illegal kickback in violation of RESPA, the Illinois Title Insurance Act, and the Illinois Consumer Fraud Act. He sought to represent a class of all individuals injured by the alleged violations. Six months later, Janice Howland replaced Sharbaugh as the named plaintiff.

Howland then moved the district court to certify a class "of all people who purchased, sold or mortgaged real property in the State of Illinois and who paid for a title insurance policy from the Defendant, any part of which premium was then shared with an attorney who did not perform 'core title agent services' separate from attorney services in exchange for such fee." The district court reasoned that although certain questions under RESPA were common to the class, it could not ultimately determine whether each transaction was a violation without a transaction-specific inquiry to determine what services (core and otherwise) the agent provided and whether the compensation paid was unreasonably high and thus amounted to a kickback. Therefore, it concluded, the individual issues predominated over

common ones and the case was not suited for class treatment. It denied the motion for class certification and a subsequent motion for reconsideration.

Howland next sought to amend her proposed class definition to add two additional limitations, namely (1) that the search summary sheet that the agent returned "made no changes or additions to the information transmitted by First American" and (2) that First American paid "the full amount of compensation called for under the agency agreement or contract." The district court noted that the new definition might alleviate some of the individual inquiries necessary, but concluded that it did not eliminate the need for a transaction-specific inquiry to determine liability: the unaltered search summary sheet was not evidence that an agent performed no core title agent services, merely that those services were not documented because they did not entail changes to the search summary sheet. The district court denied the second motion for class certification and then a motion to reconsider.

The case then proceeded on Howland's individual claims. Once discovery was completed, First American moved for summary judgment. Rather than respond, Howland accepted an offer of judgment for her individual claim, while purportedly reserving the right to appeal the denial of class certification.[1] The district

---

[1] Because of the intervention of a class member whose individual claims have not been settled, we need not address the issue

(continued...)

court entered judgment on March 9, 2011. Three weeks later, putative class member Scott Tegtmeyer was granted leave to intervene. Both Howland and Tegtmeyer filed timely notices of appeal, challenging the district court's denial of class certification.

## II.

Because Rule 23 generally entrusts the certification of class-action lawsuits to the broad discretion of the district court, this Court will reverse a certification decision only when it finds an abuse of discretion. *See Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 976 (7th Cir. 2011). Legal questions, however, are always reviewed de novo because a district court abuses its discretion if it applies an incorrect law. *Id.* To certify a class under Rule 23(b)(3), as the plaintiffs seek, they must establish (not merely allege) that the elements of Rule 23(a) are met, including the existence of common issues, and further that those common issues predominate over individual issues and that a class action would be a superior method of adjudicating the claims. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2548-49 & n.2 (2011). In this case, the district court denied class certification because it believed that individual inquires would be necessary to determine liability in favor of each class

---

[1]  (...continued)

of whether Howland's settlement terminated her stake in the case and with it her right to appeal the denial of certification. *See Muro v. Target Corp.*, 580 F.3d 485, 491 (7th Cir. 2009).

member and thus that Rule 23(b)(3) was not satisfied. It did not reach the issue of whether the other criteria of Rule 23(b)(3) and Rule 23(a) were met. The district court reached the only reasonable conclusion on certification, and thus did not abuse its discretion.

## A.

RESPA was enacted in 1974 with the goal of ensuring that consumers "are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). Congress sought to accomplish this by mandating certain disclosures to help consumers become better shoppers for settlement services and by prohibiting "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." *Id.* § 2601(b).

Section 8 of RESPA and its implementing regulations combat the latter concern. Section 8(a) prohibits any person from giving or accepting "any fee, kickback, or thing of value pursuant to any agreement or understanding" that the payee will refer business in exchange for the payment. 12 U.S.C. § 2607(a). Section 8(b) likewise prohibits the payment or receipt of "any portion, split, or percentage of any charge made . . . other than for services actually performed." *Id.* § 2607(b). Section 8 also, however, enumerates certain conduct or transactions that do not violate the statute. Two are relevant here. First,

Section 8(c)(1)(B) applies specifically to title agents, protecting payments "by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance." *Id.* § 2607(c)(1)(B). Second, Section 8(c)(2) applies generally to "the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." *Id.* § 2607(c)(2).

The implementing regulations flesh out the prohibitions and exceptions. The regulations clarify that Section 8(b) prohibits not only charges where no services are performed but also where only "nominal services are performed" or where the charges are duplicative. *See* 24 C.F.R. § 3500.14(c). This interpretation also gives rise to an important limitation on payments to title agents allowed under Section 8(c)(1)(B): if the title agent is also an attorney for the buyer or seller, the agent may not receive compensation as a title agent unless he performs "core title agent services (for which liability arises) separate from attorney services." 24 C.F.R. § 3500.14(g)(3). The services necessary to invoke the Section 8(c)(1)(B) safe harbor include, at a minimum, "the evaluation of the title search to determine the insurability of the title, the clearance of underwriting objections, the actual issuance of the policy or policies on behalf of the title insurance company, and, where customary, issuance of the title commitment, and the conducting of the title search and closing." *Id.*

As an example, the regulations describe the situation in which a real estate attorney violates Section 8 of

RESPA by receiving duplicative payments and payments for nominal services. *See* 24 C.F.R. Pt. 3500, App. B, Ex. 4. As part of his representation of his clients, the attorney orders and reviews title insurance policies. He also contracts with a title insurance company to prepare the title insurance application, reviews a preliminary commitment prepared by the title insurance company, and clears exceptions to the title policy before closing, if he chooses. In the example, the title insurance company and the attorney have violated Section 8. The attorney's mere re-examination of the title insurance company's preliminary commitment is a nominal service at best, and he has already been compensated by the consumer for the services he provided in his attorney capacity. The lesson: "Referral fees or splits of fees may not be disguised as title agent commissions when the core title agent work is not performed.*" Id.*

Further, the regulations also add a critical qualification to Section 8(c)(2)'s general exception of payments for goods provided or services performed. "If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided." 24 C.F.R. § 3500.14(g)(2).

In a 1996 statement of policy, the Department of Housing and Urban Development ("HUD") provided additional, less formal, guidance regarding the agency's interpretation of the exceptions in Section 8(c)(1)(B) and Section 8(c)(2) and the interplay between the two. *See* HUD, *RESPA Statement of Policy 1996-4*, 61 Fed. Reg. 49398

(Sept. 19, 1996). After reiterating the regulation's definition of core title services, HUD cautioned that, in its opinion, a title agent does not qualify under the Section 8(c)(1)(B) safe harbor if the title insurance company performs any of the core title services itself. *Id.* at 49400. For example, the safe harbor would not apply if a title insurance company provided a "pro forma commitment"—"a document that contains a determination of the insurability of the title upon which a title insurance commitment or policy may be based," as well as the information that would be contained in the schedules to a title insurance commitment, and that "may legally constitute a commitment when countersigned by an authorized representative." *Id.* at 49399.

HUD also explained that a title insurance agent's failure to qualify for the core title services safe harbor under Section 8(c)(1)(B) of RESPA does not preclude payment for services actually performed under Section 8(c)(2). *Id.* at 49400. Thus, a title insurance agent who performs only some of the required core title services, or who performs other services on the title insurance company's behalf, may still be paid so long as the payment is reasonably related to the value of the services performed. *See* 24 C.F.R. § 3500.14(g)(2). However, because such an agent provides less than the full gamut of core title services, "the payment [must be] reasonably commensurate with the reduced level of responsibilities assumed by the agent," and must thus "reflect[] a meaningful reduction from the compensation generally paid to agents in the area who perform all core title services." 61 Fed. Reg. at 49400.

B.

We are aware of no federal cases considering the suitability of class action treatment for alleged kickbacks to real estate attorney title agents based on compensation for nominal or duplicative services. Nor has HUD pronounced, formally or informally, on the matter. RESPA Section 8 kickback cases, however, are generally not a good fit for class action treatment. This is because in many cases the kickbacks come in the form of payments to persons already involved in the real estate settlement process and who have some role in referring or directing consumers to a particular company. The claim in these cases is that the amount paid exceeds the value of the services performed or the goods provided and that the extra amount is intended to compensate for the referral itself. Whatever the validity of such claims, the problem at the class certification stage is that the existence or the amount of the kickback in these cases generally requires an individual analysis of each alleged kickback to compare the services performed with the payment made.

This is the conclusion that the courts and HUD have reached regarding class action suits alleging kickbacks from lenders to mortgage brokers in the form of yield-spread premiums. *See, e.g., Heimmermann v. First Union Mortg. Co.*, 305 F.3d 1257, 1263-64 (11th Cir. 2002); *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1014 (9th Cir. 2002); *Glover v. Standard Fed. Bank*, 283 F.3d 953, 956-66 (8th Cir. 2002); *see also* HUD, *Statement of Policy 2001-1*, 66 Fed. Reg. 53052 (Oct. 18, 2001). A yield spread premium is

a payment from a lender to a mortgage broker based on the difference between the interest rate accepted by the borrower and the "par rate" offered by the lender. Such payments enable borrowers to finance up-front closing costs they might otherwise pay to mortgage brokers, but have also been criticized as blatant referral fees that compensate mortgage brokers not for their services but for pushing a higher interest rate on the borrower. *See O'Sullivan v. Countrywide Home Loans*, 319 F.3d 732, 739-40 & n.11 (5th Cir. 2003).

In 1999, HUD first articulated its position on yield spread premiums, namely that such payments are not per se illegal, but might be illegal "in individual cases or classes of transactions." *See* HUD, *Statement of Policy 1999-1*, 64 Fed. Reg. 10080, 10084 (Mar. 1, 1999). Based on its reading of RESPA Section 8 and its own regulations, HUD announced a two-part test to determine whether a fee from a lender to a mortgage broker violates RESPA's kickback provisions: (1) "whether goods or facilities were actually furnished or services were actually performed for the compensation paid," and (2) "whether the payments are reasonably related to the value" of the goods, facilities, or services. *Id.*

The Eleventh Circuit initially permitted class certification in a yield spread premium case. In *Culpepper v. Irwin Mortg. Corp.*, 253 F.3d 1324, 1332 (11th Cir. 2001), that court held that because the amount of compensation for broker services was not directly tied to the services actually performed but rather to the interest rate charged to the borrower, the practice as a whole could

be said to violate RESPA Section 8. Thus, HUD's two part individualized inquiry was not necessary and the plaintiffs could establish a class-wide violation. In 2001, HUD responded to *Culpepper* and clarified that it did not agree that a RESPA violation can be proved solely from the fact that the payment is not designed to vary depending on the services actually performed. Where *any* services have been provided, the only way to prove a Section 8 violation is to examine the individual transaction to compare the services with the compensation. Following that clarification, the Eleventh Circuit acquiesced to HUD's position: Because liability under RESPA Section 8 cannot be established without answering both questions, and because the second question necessarily involves scrutiny of each transaction, whether a particular lender's yield spread premiums constitute a kickback cannot be determined on a class-wide basis. *See Heimmermann*, 305 F.3d at 1263-64.

The Fifth Circuit has extended the reasoning of the yield spread premium cases to alleged kickbacks based on pre-set fee schedules generally. In *O'Sullivan*, the court considered a class action claim alleging that a mortgage lender and law firms violated Section 8 of RESPA by splitting fees according to a fee schedule that did not represent the reasonable value of the services. 319 F.3d 732. There, the lender paid a document preparation fee to a law firm. The law firms in turn reimbursed the lender with a portion of that fee, ostensibly to cover the lender's share of the costs associated with preparing the loan documents. *Id.* at 736-37. These reimbursement amounts are set by a schedule and vary

only according to the loan type, despite significant loan-to-loan variations in the amount and type of work performed. *Id.* The plaintiffs argued that this overall practice violated RESPA, and thus that the violations could be established on a class-wide basis. *Id.* at 737. The Fifth Circuit analogized the case to the yield spread premium line of cases and invoked the same "reasonable relationship" test that prevents class certification in yield spread premium claims. *Id.* at 739-41. "Because RESPA § 8 liability is established by making individual comparisons of compensation to actual services," and because the lender's services in each transaction varied, each individual transaction would require its own analysis. *Id.* at 742. Under these circumstances, common questions did not predominate over individual ones. *Id.*

Similarly, in *Mims v. Steward Title Guaranty Co.*, 590 F.3d 298 (5th Cir. 2009), the Fifth Circuit refused class certification for alleged overcharges for title insurance. The plaintiffs alleged that the title insurance company had failed to apply mandatory discounts under state law. They argued that the difference between the rate allowed by law and the rate charged was a fee for which no services were provided and that the split of this fee between the title insurance company and its title agents violated Section 8(b). *See id.* at 301-02. Citing *O'Sullivan*, the court disagreed and concluded that HUD's Section 8 liability standard requires a transaction-specific "inquiry into the reasonableness of the payments for goods and services." *Id.* at 307.

The lone exception to the anti-class action trend in RESPA Section 8 cases comes from the Eleventh

Circuit in *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314 (11th Cir. 2008). There, the plaintiff sought class certification for his claim that his real estate agent's "Administrative Brokerage Commission" fee was a "fee for which no service was performed" and thus violated RESPA Section 8(b), as interpreted by the Eleventh Circuit.[2] *Id.* at 1319. The court distinguished the Fifth Circuit's decision in *O'Sullivan* and its own holding in *Heimmermann*: those decisions denied class certification where it was necessary to apply the reasonable relationship test to services actually performed, whereas the *Busby* class alleged fees where no services had been performed at all. *Id.* at 1325. In these specific circumstances, the court concluded that the common question—whether the fee was charged for no services—predominated any individual question. *Id.* at 1325-26.

## C.

With this history in mind, the result in this case becomes relatively straightforward. There are two alternatives. If the plaintiffs are claiming that First American was splitting its fees with attorney title agents who performed no services at all, class certification might be a possibility, at least under the Eleventh Circuit's decision in *Busby*. But to take advantage of this possibility, the

---

[2] This court has previously concluded that overcharges do not violate Section 8(b) unless they are shared with another party. *See Krzalic v. Republic Title Co.*, 314 F.3d 875, 881 (7th Cir. 2002).

plaintiffs would need to offer evidence that the attorney agents performed no work, not mere allegations. *See Wal-Mart Stores*, 131 S. Ct. at 2551-52. By limiting the class definition to those instances where the search summary sheet that First American provided to the attorney was returned without alteration, the plaintiffs claim that the class would include only those cases where the attorney agent provided no services and instead simply signed the already adequate title examination in exchange for a significant portion of the title insurance fee. But as the district court correctly noted, the absence of alterations to the search summary sheet does not prove that the attorney did no work—his independent examination may have come to the same result, or he may have cleared any obstacles to insurability that he discovered. Thus, even where the search summary sheets were returned unaltered, the determination that no services were provided would need to be made on a case-by-case basis, which precludes certification under Rule 23(b)(3).

If, on the other hand, the plaintiffs are claiming that the attorney title agents were overcompensated for services they actually performed, the analysis changes. Precedent suggests, and we agree, that RESPA Section 8 requires individualized inquiries into the services and compensation provided in each transaction and whether the two were reasonably related. That transaction-specific inquiry prevents class treatment.

Notwithstanding the clear trend against class actions in RESPA Section 8 cases, the plaintiffs propose to establish a per se violation of Section 8 of RESPA by

establishing that the search summary sheet that First American provided to its attorney title agents was a "pro forma commitment," as defined by HUD in the 1996 Policy Statement. Therefore, they claim, attorneys subject to the class action were improperly paid for purely nominal or duplicative services in every transaction. According to this theory, the fact that the search summary sheet was returned unchanged is simply evidence that it was a pro forma commitment in the first place.

Whether the search summary sheet is a pro forma commitment is indeed a question common to the entire class. First American persuasively argues that the search summary sheet is merely title evidence, which is permissible under HUD's interpretation of Section 8(c)(1)(B). *See* 61 Fed. Reg. at 49400. The plaintiffs counter that because all of the information needed to issue the title commitment is present in the search summary sheet, First American has already completed a preliminary title examination and the attorney agents' work is duplicative.

We need not resolve that question because the statutory exceptions in Section 8(c)(1)(B) and Section 8(c)(2) are not mutually exclusive. Thus, even if we assume, *arguendo*, that the plaintiffs are correct that the search summary sheet is a pro forma commitment (and that HUD is correct that such a pro forma commitment would preclude the Section 8(c)(1)(B) safe harbor), this fact standing alone would not allow a class-wide determination of liability. An additional inquiry is always

required because as long as the agents performed any services on First American's behalf, they are allowed a reasonable fee under Section 8(c)(2). To establish a violation of Section 8, the plaintiffs would need to show that the fee paid was not reasonably related to the services provided. And to proceed as a class, the plaintiffs must show that whether the compensation was reasonable can be resolved on a class-wide basis. But we agree with our sister circuits and HUD that where a person provides *any* services, the Section 8(c)(2) exception demands an individual analysis of each transaction. This case is no exception.

The plaintiffs creatively seek to avoid the need for individual analyses of each transaction. They argue that even if attorney agents were entitled to some reasonable compensation for services they actually performed under Section 8(c)(2), First American violated RESPA Section 8 in every case by paying the full contractual amount rather than a reduced amount. In support of this argument, the plaintiffs appeal to HUD's 1996 opinion that payments to title agents under Section 8(c)(2) must "be reasonably commensurate with the reduced level of responsibilities assumed," and "reflect[] a meaningful reduction from the compensation generally paid to agents in the area who perform all core title services." The plaintiffs then stretch this position into a per se violation of RESPA Section 8 on a class-wide basis. Noting that the agency contract requires the agent to "determine insurability of title by preparing title examinations," the plaintiffs argue that this provision is synonymous with HUD's definition of "core title services"

and thus that an attorney title agent must perform all core title services to earn the full scheduled compensation. Further, the plaintiffs note that the agency contract limits attorneys' actions on First American's behalf to those stated in the contract, and argue that this eliminates any possibility that attorney agents may have been compensated under Section 8(c)(2) for services other than core title services. Thus, according to the plaintiffs, because the contract sets the appropriate payment rate for core title services and limits the agent's services to core title services, any attorney who was paid the full contract rate was necessarily paid more than the reasonable value of his services in violation of RESPA Section 8.[3]

There are two flaws with the plaintiffs' argument. First, the argument conflates what is required under the agency contract—performing a title examination according to the parameters in the contract and taking liability for it—with the more exhaustive requirements of the core title services safe harbor under Section 8(c)(1)(B) and 24 C.F.R. § 3500.14(g)(3). The contract does not estab-

---

[3] The plaintiffs cite a case from the Illinois Court of Appeals, *Chultem v. Ticor Title Insurance Co.*, 927 N.E.2d 289 (Ill. App. 1 Dist. 2010), in support of this argument. That case has little persuasive value, however, because the Illinois standards for class certification differ from the federal rules. Thus, *Chultem* merely assumed (without evidence) that the plaintiffs could prove that a payment of the full contract rate would violate RESPA. The federal rule requires a more rigorous analysis. *See Wal-Mart Stores*, 131 S. Ct. at 2551-52.

lish "the compensation generally paid to agents in the area who perform all core title agent services." 61 Fed. Reg. at 49400. Nor does it require that the attorney agent perform all core title services or qualify for the safe harbor. It merely establishes what First American pays to attorney title agents who perform title examinations for it—apparently with the help of the search summary sheet generated by the title insurer. And the plaintiffs have not pointed to any other evidence of the compensation generally paid to agents or how it compares to First American's scheduled payment rates.

Second, and more fundamental, we do not read the HUD's 1996 Statement of Policy to suggest a per se rule that a title agent who does not qualify under the Section 8(c)(1)(B) safe harbor may not be paid a full contractual title examination fee under Section 8(c)(2). Such a position would be inconsistent with HUD's later resistence to per se kickback rules. And indeed, HUD's statements regarding Section 8(c)(2) do not provide a "rule" at all. They simply convey HUD's sensible "enforcement position" that it will scrutinize certain practices that it believes may indicate a violation of RESPA Section 8.

Certainly, if the plaintiffs are correct that the search summary sheets are thinly veiled pro forma commitments, First American's compensation to its attorney agents may very well raise suspicions with HUD. It may also be important evidence, in individual cases, that an attorney agent's fee was not reasonably related to the services he provided. But such putatively suspicious

practices do not, in and of themselves, constitute a per se violation of RESPA Section 8. Rather, as the statute, regulations, later HUD guidance, and court decisions have made clear, to prove a Section 8 violation, the plaintiffs must establish that the payment to an individual title agent was not reasonably related to the services that agent provided. As the Fifth Circuit explained, "RESPA § 8 liability is established by making individual comparisons of compensation to actual services, not by presuming fire where there is smoke." *O'Sullivan*, 319 F.3d at 742. Because there is no evidence that either the actual services performed or the compensation paid were the same across the class, there is no way to make this determination on a class-wide basis and offer class-wide relief.

### III.

As the preceding analysis shows, RESPA Section 8 kickback claims premised on an unreasonably high compensation for services actually performed are inherently unsuitable for class action treatment, and this case is no exception. Further, the plaintiffs cannot establish the sole recognized exception, namely that First American split fees with attorney agents in fact who performed *no services* on a class-wide basis. Accordingly, the district court did not err in determining that individual issues predominate over common ones. The district court's denial of class certification is AFFIRMED.