# Illinois Official Reports

## Appellate Court

---

*Chultem v. Ticor Title Insurance Co.*, 2015 IL App (1st) 140808

---

| | |
|---|---|
| Appellate Court Caption | DOLJIN CHULTEM, Individually and on Behalf of All Others Similarly Situated, Plaintiffs-Appellants and Cross-Appellees, v. TICOR TITLE INSURANCE COMPANY, CHICAGO TITLE AND TRUST COMPANY, and FIDELITY NATIONAL FINANCIAL, INC., Defendants-Appellees and Cross-Appellants.–PAUL COLELLA, Individually and on Behalf of All Others Similarly Situated, Plaintiffs-Appellants and Cross-Appellees, v. CHICAGO TITLE INSURANCE COMPANY and CHICAGO TITLE AND TRUST COMPANY, Defendants-Appellees and Cross-Appellants. |
| District & No. | First District, Third Division<br>Docket Nos. 1-14-0808, 1-14-0820 cons. |
| Filed<br>Rehearing denied | December 16, 2015<br>January 12, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 06-CH-09488, 06-CH-09489; the Hon. Mary L. Mikva, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Power Rogers & Smith, PC (Todd A. Smith and Joseph A. Power, Jr., of counsel), Korein Tiller LLC (Stephen M. Tillery, George A. Zelcs, and John A. Libra, of counsel), and Myron M. Cherry & Associates, LLC (Myron M. Cherry and Jacie Zolna, of counsel), all of Chicago, for appellants. |

Fidelity National Law Group (Scott C. Lascari, of counsel), Skadden, Arps, Slate, Meagher & Flom (Edward M. Crane and Timothy M. Frey, of counsel), and Jenner & Block LLP (Michael T. Brody and Elin I. Park, of counsel), all of Chicago, and Hahn Loeser & Parks LLP, of Cleveland, Ohio (Robert J. Fogarty, Erica L. Calderas, and Dennis R. Rose, of counsel), for appellees.

| Panel | PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion. |
| | Justice Lavin concurred in the judgment and opinion. |
| | Justice Pucinski dissented, with opinion. |

## OPINION

¶ 1    In this consolidated class action appeal, plaintiffs Doljin Chultem and Paul Colella, individually and on behalf of all others similarly situated, appeal the trial court's ruling that defendants Ticor Title Insurance Company (Ticor), Chicago Title Insurance Company (Chicago Title), Chicago Title and Trust Company (CT&T) and Fidelity National Financial, Inc. (Fidelity), (collectively, the "title companies") did not make illegal kickback payments by splitting a fee with attorneys for their referral of business to the title companies in violation of the Illinois Title Insurance Act (215 ILCS 155/1 (West 2002)) (Title Act)[1] and the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2002)) (Consumer Fraud Act). Plaintiffs assert that payments made by the title companies to attorneys who also served as title agents (attorney agents) were unlawful because the title companies provided those attorneys with a *pro forma* title commitment that determined the insurability of a property's title–a function they assert must be performed by the attorney agents to earn the fee paid by the title companies. Plaintiffs claim that because the attorney agents received the *pro forma* commitment, they did not perform "core title services" and the title company's payment was unearned and, in reality, an illegal kickback. Because recent case law fails to support plaintiffs' position, we affirm.

¶ 2                              BACKGROUND
¶ 3                    A. RESPA and HUD Policy Statements
¶ 4    We begin by providing a brief overview of the pertinent statutory and regulatory framework to place in context the issues and arguments raised in this appeal. The Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.* (2000)) (RESPA) is a federal statute establishing various requirements relating to the residential real estate settlement process. *Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A.*, 186 Ill. 2d 472, 481 (1999). Congress enacted RESPA to provide purchasers and sellers of real property with more

---

[1]The Title Act incorporates the Real Estate Settlement Procedures Act (12 U.S.C. § 2607 (2000)). See 215 ILCS 155/21 (West 2002).

detailed advance disclosure of the settlement costs associated with real estate closings. *Id*. Congress also sought to protect consumers "from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a) (2000). More specifically, Congress sought to eliminate kickbacks or referral fees for title insurance business that contributed to increased costs of settlement services. 12 U.S.C. § 2601(b)(2) (2000).

¶ 5     Two sections of RESPA address these practices. RESPA section 2607(a) (12 U.S.C. § 2607(a) (2000)) prohibits kickbacks for referrals and states:

> "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." *Id*.

To establish a violation of section 2607(a), the following elements must be demonstrated: "(1) a payment or thing of value; (2) given and received pursuant to an agreement to refer settlement business; and (3) an actual referral." *Galiano v. Fidelity National Title Insurance Co.*, 684 F.3d 309, 314 (2d Cir. 2012).

¶ 6     RESPA section 2607(b) (12 U.S.C. § 2607(b) (2000)) prohibits unearned fee splitting and states in pertinent part:

> "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." *Id*.

Section 2607(b) is violated where: (1) a person gives or accepts any portion, split or percentage of any charge; (2) the fee-split relates to the rendering of a real estate settlement service; and (3) the fee-split or payment is made "other than for services actually performed." (Internal quotation marks omitted.) *Sosa v. Chase Manhattan Mortgage Corp.*, 348 F.3d 979, 983 (11th Cir. 2003). Simply stated, a party violates section 2607(b) where no services are performed in exchange for the fee charged to the consumer by a title company and later split with another party. *Clements v. LSI Title Agency, Inc.*, 779 F.3d 1269, 1274 (11th Cir. 2015) (a plaintiff must plead that " 'no services were rendered in exchange for a settlement fee' " (quoting *Friedman v. Market Street Mortgage Corp.*, 520 F.3d 1289, 1298 (11th Cir. 2008))).

¶ 7     As is apparent, each subsection addresses specific conduct not addressed by the other subsection, *i.e.*, "[s]ubsection (a) prohibits certain kickbacks (those agreed to in exchange for referrals) and subsection (b) prohibits certain unearned fees (those paid from a part of the charge to the customer)." *Freeman v. Quicken Loans, Inc.*, 566 U.S. ___, ___, 132 S. Ct. 2034, 2043 (2012).

¶ 8     In enacting RESPA, Congress also included "safe harbor provision[s]" that exempt certain payments from the prohibition against kickbacks. *Johnson v. Matrix Financial Services Corp.*, 354 Ill. App. 3d 684, 689 (2004). RESPA section 2607(c)(1)(B) provides that the payment of a fee "by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance" shall not be considered a prohibited payment. 12 U.S.C. § 2607(c)(1)(B) (2000). RESPA section 2607(c)(2) provides that the payment "to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed" shall likewise not be

considered a prohibited payment. 12 U.S.C. § 2607(c)(2) (2000). The two safe harbor exemptions are not mutually exclusive. *Howland v. First American Title Insurance Co.*, 672 F.3d 525, 533 (7th Cir. 2012).

¶ 9     Until recently, the Department of Housing and Urban Development (HUD) was the administrative agency responsible for drafting regulations and rendering interpretations consistent with RESPA's objectives.[2] *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 124 (2d Cir. 2007). Following RESPA's enactment, HUD promulgated regulations using language that mirrors RESPA's provisions regarding the prohibition against kickbacks and unearned fees. The regulations provide that "any referral of a settlement service is not a compensable service, except as set forth in § 3500.14(g)(1)." 24 C.F.R. § 3500.14(b) (2001). Section 3500.14(g)(1) adopts RESPA's "safe harbor" provisions in language identical to the statute. The regulation addressing fee splitting provides further elaboration and states that "[a] charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c) (2001). The regulations specify that for an attorney, who provides multiple services and is in a position to refer settlement service business, to receive "a payment for providing additional settlement services as part of a real estate transaction, such payment must be for services that are actual, necessary and distinct from the primary services provided by such person." 24 C.F.R. § 3500.14(g)(3) (2001). To further clarify, the regulation provides the following example:

> "[F]or an attorney of the buyer or seller to receive compensation as a title agent, the attorney must perform core title agent services (for which liability arises) separate from attorney services, including the evaluation of the title search to determine the insurability of the title, the clearance of underwriting objections, the actual issuance of the policy or policies on behalf of the title insurance company, and, where customary, issuance of the title commitment, and the conducting of the title search and closing." 24 C.F.R. § 3500.14(g)(3) (2001).

¶ 10    In 1996, HUD issued a statement of policy (RESPA Statement of Policy 1996-4, 61 Fed. Reg. 49398, 49399-400 (Sept. 19, 1996)) (Florida Policy Statement)[3] reflecting its interpretation of the safe harbor exceptions set forth in section 2607(c)(1)(B) and section 2607(c)(2). *Howland*, 672 F.3d at 529. In HUD's opinion, "a title agent does not qualify under the Section 8(c)(1)(B) safe harbor if the title insurance company performs any of the core title services itself," including preparation of a preliminary or *pro forma* commitment. *Id*. at 529-30 (citing Florida Policy Statement, 61 Fed. Reg. at 49400). HUD further explained that an attorney agent may receive compensation for services performed under section 2607(c)(2) even though payment was prohibited under the first safe harbor provision on the basis that the attorney did not perform any "core title agent services." (Internal quotation marks omitted.) *Id*. at 529. However, HUD cautioned that the payment must be

---

[2] On July 21, 2011, the Bureau of Consumer Financial Protection took over HUD's consumer-protection functions. *Freeman*, 566 U.S. at ___ n.4, 132 S. Ct. at 2039 n.4. In this opinion, we continue to refer to HUD as the responsible agency.

[3] This policy statement is commonly referred to as the "Florida Policy Statement" because it specifically addressed the issues and practices involving title insurance companies and title insurance agents regarding their compliance with RESPA that HUD reviewed in Florida.

"reasonably related to the value of the services performed" and less than the payment made to an attorney who performed all "core title services." *Id*. at 530; see 24 C.F.R. § 3500.14(g)(2) (2001); Florida Policy Statement, 61 Fed. Reg. at 49400.

¶ 11 In 2001, HUD issued a statement of policy (RESPA Statement of Policy 2001-1, 66 Fed. Reg. 53052-01 (Oct. 18, 2001)) (2001-1 SOP) detailing its position regarding the payment of yield spread premiums by lenders to mortgage brokers. In the 2001-1 SOP, HUD reiterated that its guidance and regulations have uniformly interpreted section 8b–codified at 12 U.S.C. § 2607(b)–as prohibiting all unearned fees. 2001-1 SOP, 66 Fed. Reg. at 53057. HUD explained that section 8(b) "prohibits any person from giving or accepting any fees other than payments for goods and facilities provided or services actually performed." *Id*. at 53053. HUD also explained that a single service provider incurs liability "under Section 8(b) when it charges a fee that exceeds the reasonable value of goods, facilities, or services provided." *Id*. at 53059. The policy statement considered a prohibited unearned fee to include a service provider charging "the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of goods or facilities provided or the services actually performed." *Id*.

¶ 12 Interpretation of section 2607(b) next significantly evolved following the United States Supreme Court's decision in *Freeman*, 566 U.S. at ___, 132 S. Ct. at 2034. In *Freeman*, the Court addressed whether a charge for settlement services must be divided between two or more persons to be considered a prohibited fee splitting payment under section 2607(b). *Id*. at ___, 132 S. Ct. at 2037. The *Freeman* Court identified the dispute between the parties as to whether section 2607(b) "prohibits the collection of an unearned charge by a single settlement-service provider–what we might call an undivided unearned fee–or whether it covers only transactions in which a provider shares a part of a settlement-service charge with one or more other persons who did nothing to earn that part." *Id*. at ___, 132 S. Ct. at 2039. The court concluded that section 2607(b) does not apply where a settlement-service provider retains the fee charged to the customer in its entirety, *i.e.*, where there is no dividing or splitting of the fee with another party. *Id*. at ___, 132 S. Ct. at 2041. Thus, no violation of section 2607(b) occurred and the court affirmed summary judgment in favor of the settlement-service provider. *Id*. at ___, 132 S. Ct. at 2044. We further discuss below *Freeman*'s application to the issue presented in this appeal.

¶ 13 B. Procedural History

¶ 14 This case commenced when Chultem and Colella each filed a complaint, individually and on behalf of all others similarly situated, against the title companies claiming that the title companies made unlawful payments to the attorney agents because the attorney agents did not perform "core title agent services" in addition to the services the attorneys rendered to their clients in a real estate transaction. The Colella proposed class included transactions where individuals purchased title insurance from Chicago Title during the period from January 1, 2001, to September 1, 2005, and Chicago Title paid attorney agents their full compensation. The Chultem proposed class included transactions where individuals purchased title insurance from Ticor during the period from February 1, 2000, to September 30, 2005, and Ticor paid the attorney agents in full after sending the attorney agents a preliminary title exam (A-Exam) that was not changed in any way by the attorney agents.

¶ 15    According to the complaints, which were amended multiple times, the putative class members purchased, sold or mortgaged real property and paid for a title insurance policy from the title companies to protect the purchasers against any defect or irregularity in the property's title. A portion of the premium paid for the policy was then shared by the title company with an attorney agent in exchange for allegedly performing title services. The title companies typically paid an attorney agent 70% to 80%, and at all times more than 50%, of the premium collected for the title insurance policy. Plaintiffs claimed the title companies' payments to the attorney agents were unlawful because the attorney agents did not perform any "core title services"[4] if the title companies sent the attorney agents a title insurance commitment, *i.e.*, either a Preliminary Commitment provided by Chicago Title to the Colella class members or an A-Exam provided by Ticor to the Chultem class members. Plaintiffs argued that those documents examined the real property's title and determined the insurability of the property–a function that should be performed by the attorney agent to justify the payment received from the title companies. Plaintiffs alleged that the title companies disguised prohibited kickbacks for the referral of business by implementing a program where the attorney agents would receive payments from the title companies–a portion that was collected from consumers–under the guise of providing "core title agent services." The attorney agents received compensation from both the title companies–for services as a title agent–and their clients–for services as an attorney. Based on these common allegations, Chultem and Colella sought class certification.

¶ 16    In response, the title companies asserted that the payments were not unlawful because attorney agents were required to perform core title agent services, which they in fact performed, and plaintiffs received value from the title insurance issued as a direct result of the attorney agents' services. The title companies also asserted that no statute supports and no case law adopts plaintiffs' position that sending a Preliminary Commitment or A-Exam to an attorney agent automatically renders payments by the title companies to attorney agents violative of RESPA.

¶ 17    The parties continued to litigate their positions until the trial court ultimately denied plaintiffs' amended second motion for class certification. Plaintiffs filed a petition for leave to appeal pursuant to Illinois Supreme Court Rule 306(a)(8) (eff. Feb. 16, 2011) regarding the denial of class certification along with a motion to consolidate, which a different division of this court allowed. On April 15, 2010, we issued an opinion reversing the trial court's order denying class certification and remanded with instructions to certify the class. *Chultem v. Ticor Title Insurance Co.*, 401 Ill. App. 3d 226, 238 (2010). In reaching that conclusion, this court considered only the predominance element under section 2-801 of the Illinois Code of Civil Procedure (735 ILCS 5/2-801 (West 2006)), which requires "that common questions predominate over any questions involving only individual members." *Chultem*, 401 Ill. App. 3d at 235. We stated that a transaction-by-transaction review to determine whether an attorney agent provided " 'core title services' " or actually performed services was not necessary if the title companies sent the attorney agents " '*pro forma* commitments' "

_____

[4]Plaintiffs defined "core title services" as: "evaluation of the title search to determine the insurability of the title, the clearance of underwriting objections, the actual issuance of the policy or policies on behalf of the title insurance company, and, where customary, issuance of the title commitment, and the conducting of the title search and closing."

because the title companies would have unlawfully paid the attorney agents the full amount of compensation for unearned " 'core title services.' " *Id*. Accordingly, we identified two questions for the trial court to address on remand: (1) "whether the defendants were sending their attorney agents *pro forma* commitments" and (2) "whether the defendants lawfully can pay their attorney agents full contract compensation after sending them *pro forma* commitments." *Id*. at 237. This court reasoned that those determinations were questions common to all class members and would establish a right to recovery in other class members. *Id*. at 236-37.

¶ 18    Following remand, the trial court certified the class, and both parties filed motions for partial summary judgment addressing the two questions identified by this court. The trial court granted the plaintiffs' motion regarding the second question finding that the title companies were prohibited from paying attorney agents in full after sending a *pro forma* title commitment as that term was defined by the Florida Policy Statement.

¶ 19    The trial court denied both summary judgment motions on the issue of whether the Preliminary Commitments and A-Exams were *pro forma* commitments and set the case for a bench trial to address that issue. The trial court identified the underlying issue at trial as "whether there were actual, necessary and distinct services remaining after the title companies sent an A-Exam or a Preliminary Commitment to their attorney agents." The following pertinent testimony was adduced during trial.

¶ 20    The attorney agents in the underlying Colella and Chultem real estate transactions testified regarding services they performed. Richard Cohn served as the attorney agent for Chicago Title in the Colella transaction and also represented the property's sellers. Jay Orlowski served as the attorney agent for Ticor in the Chultem transaction and likewise represented the property's sellers.

¶ 21    Generally, an attorney agent performs the following services: (1) orders a title search package; (2) identifies liens or encumbrances recorded against the title; (3) ensures the clearing of liens recorded against the title; (4) verifies the individual selling the property held title to the property; (5) recommends the waiver of exceptions to title; (6) attends closings; and (7) maintains records of the transaction. Basically, an attorney agent ensures that exceptions to title are cleared so that good title is transferred during the real estate transaction, *i.e.*, obtains a release or payoff of a mortgage recorded on the property and ensures the payoff letter matches the lien. An attorney agent also communicates with the lender throughout the process to incorporate any changes to the loan amount or identity of the lender and to identify the information that should be included on the endorsements to the title policy. An attorney agent's role in clearing underwriting objections and recommending the waiver of exceptions to title results in the issuance of a title insurance policy. An attorney agent is exposed to liability for the exceptions he or she deems should be waived. Unlike an attorney agent, a seller's attorney does not provide comparable clearing and waiver services. As an attorney in an approved attorney agent program, the attorney agent must comply with guidelines established by the title companies to ensure the attorney agent does not waive exceptions without proper clearance.

¶ 22    Regarding the Colella transaction, Cohn knew before receiving the title search package from Chicago Title that he would have to clear liens recorded on the property's title, and he received payoff letters before obtaining the search package. Cohn reviewed the search package and identified exceptions that needed to be disclosed on the title commitment. Based

on his review, Cohn concluded that there were no judgments against either party that would need to be cleared before issuance of the title policy. Cohn also compared the mortgages listed in the search package with the payoff letters that he had already investigated before receiving the package. Cohn likewise compared the tax information listed in the search package with the information Cohn had previously obtained. Cohn instructed Chicago Title to change the owner's name from "Thome" as reflected in the search package to "Thomas" as reflected in the payoff letters and the sales contract (although Chicago Title never made the change) and indicated that Chicago municipal taxes must be paid and the condominium association must provide a payoff letter regarding assessments–all of which were required to determine final insurability. Cohn also attended the closing where he determined what exceptions to title should be waived.

¶ 23    Regarding the Chultem transaction, Orlowski stated that after receiving the search package, he: (1) cleared the identified exceptions noted in the A-Exam; (2) verified the property's legal description and property identification number; (3) determined whether the search package was complete; (4) attended the closing; and (5) determined what exceptions should be waived to get the final policy issued. Orlowski acknowledged that he did not identify the misspelling of the sellers' names during his review of the search package.

¶ 24    Plaintiffs offered expert testimony regarding the services provided by attorney agents. According to Jerrold Hobfoll, an attorney agent is expected to examine the raw data included in a search package, determine insurability and complete an exam summary providing the title company with the information necessary to prepare the title commitment. Hobfoll acknowledged that attorney agents must waive exceptions at closing, which was a core title service under RESPA, and a seller's attorney would not provide that service. Hobfoll believed that an attorney agent who does not perform core title services under section 8(c)(1)(b) may still be paid for services actually performed under section 8(c)(2) provided that the payment is reasonably commensurate with the reduced work load or responsibilities assumed by the attorney agent. Hobfoll agreed that an attorney agent provided some services before and after a search package was received from the title company and that the attorney agent should be compensated for those services, which ranged, in his opinion, from 20% to 50% of the full amount of the attorney agent's fee. Hobfoll also agreed that an attorney who was not an attorney agent would not assume responsibility or liability for the title examination function. Hobfoll conceded that Cohen's search of tax information would be an actual service provided to the title company, albeit a minimal one.

¶ 25    Consistent with Hobfoll's testimony, plaintiffs' expert Grant Mitchell stated that an attorney agent may be paid for actual work performed under section 8(c)(2), even for work not considered core title services. Mitchell opined that an attorney agent who received a *pro forma* commitment may be paid for any actual service performed, but may not be paid the full contract amount as an attorney agent.

¶ 26    Plaintiffs' expert Michael Rooney disputed the claim that the determination of insurability was an ongoing process completed upon the issuance of a title insurance policy. But he agreed that throughout the class period, the attorney agents issued or caused the issuance of title polices, which was a core title service, and that a nonattorney agent representing a seller would not issue a title commitment. Rooney acknowledged that attorney agents must perform the function of clearing liens and judgments and exercise their authority to waive or cause the waiver of exceptions at the closing. Rooney stated that unlike attorney

agents, a seller's attorney incurs no liability associated with the clearing of exceptions to title. Rooney also acknowledged that after an attorney agent received a search package, an attorney agent must still perform services to determine insurability, *i.e.*, whether the mortgage to be insured was valid and enforceable and whether the deed would effectively transfer title to the purchaser.

¶ 27　　Following trial, the parties filed posttrial briefs. The title companies also moved to decertify the class, which the trial court denied. The trial court issued a written order finding that "actual, necessary and distinct services" still remained for attorney agents to perform relating to the issuance of a title insurance policy even where they received a title exam or preliminary commitment that met most of the requirements of a *pro forma* commitment under the Florida Policy Statement. The trial court rejected plaintiffs' assertion that the attorney agents must perform *all* of the core title services to avoid violating section 2607 and that, under *Freeman*, it was irrelevant whether an attorney agent was overpaid for their services when performing less than all core title services. Accordingly, the trial court ruled that the title companies' payments to attorney agents under their attorney agent programs did not violate RESPA's prohibition against either kickbacks for referral fees or fee splitting because the evidence offered at trial established that attorney agents provided title services independent of the services provided as counsel for the seller. Thus, the court entered judgment in favor of the title companies because plaintiffs could not demonstrate a RESPA violation, which necessarily precluded a finding of a violation of the Title Act and Consumer Fraud Act. Plaintiffs timely appealed.

¶ 28　　The title companies filed a cross-appeal contending that if the judgment in their favor is reversed, we should consider whether the trial court erred in refusing to decertify the class.

¶ 29　　　　　　　　　　　　　　　　　ANALYSIS

¶ 30　　On appeal, plaintiffs claim that the trial court erred in entering judgment in favor of the title companies on the basis that sections 2607(a) and (b) were not violated where an attorney agent performed any service in connection with the issuance of a title insurance policy in exchange for a portion of the payment received by the title company from consumers in a real estate transaction. Plaintiffs claim that the payments made to the attorney agents were illegal because they did not earn their compensation. We disagree.

¶ 31　　We will not reverse a trial court's judgment entered following a bench trial unless the judgment was against the manifest weight of the evidence. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008); see also *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 154 (2005) (trial court's findings of fact will not be reversed unless the findings are against the manifest weight of the evidence). A judgment is against the manifest weight of the evidence "only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). We review a court's interpretation of RESPA *de novo*. *Freeman v. Quicken Loans, Inc.*, 626 F.3d 799, 801 (5th Cir. 2010), *aff'd*, 566 U.S. ___, 132 S. Ct. 2034 (2012); see also *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 439 (2010) (issues involving statutory construction are questions of law subject to *de novo* review).

¶ 32　　Plaintiffs suggest that the only standard of review applicable to the issues on appeal is *de novo* because their appeal presents solely questions of law. In essence, plaintiffs contend

that the trial court erred in denying their motion for summary judgment on the issue of whether the Preliminary Commitments and A-Exams provided to attorney agents constituted *pro forma* commitments, which under plaintiffs' theory would preclude the attorney agents from collecting their full fee. But while we agree that we review the trial court's interpretation of RESPA *de novo*, the court's findings regarding the nature of the attorney agent programs, *i.e.*, whether they were "make-work" programs, as plaintiffs contended, or whether they instead required the attorney agents to actually perform services in exchange for a fee, are entitled to deference under the manifest weight standard.

¶ 33     We first consider the application of *Freeman*'s rationale to this case. Because RESPA is a federal statute, pronouncements of the United States Supreme Court are controlling with respect to the statute's interpretation. *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 33. Plaintiffs correctly note that *Freeman* addressed section 2607(b) (whether the prohibition against fee-splitting requires sharing a fee between two parties) and did not separately analyze section 2607(a) (kickbacks) and that this case involves claimed violations of both subsections. We find this distinction is irrelevant because *Freeman*'s reasoning relating to 2607(b) is readily applicable to section 2607(a). Moreover, the record establishes that the title companies and the attorney agents split the fee collected from consumers relating to the purchase of a title insurance policy, which is the precise context the court analyzed in *Freeman*. Furthermore, we consider *Freeman* dispositive because it indisputably considered the section 2607(b) "other than for services actually performed" statutory language. Both safe harbor provisions use an abridged version of that phrase, but importantly incorporate the same "services actually performed" language. Unless a contrary intent by Congress is clearly evident, "use of the same words or phrases in different sections of statute should be given a consistent meaning." *Clardy v. Rapistan Division of Lear Siegler, Inc.*, 254 Ill. App. 3d 1066, 1070 (1993). It is well settled that statutory "provisions should be read in concert and harmonized." *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 25. As recognized by *Freeman*, subsection (b) is a neighboring provision to subsection (a). *Freeman*, 566 U.S. at ___, 132 S. Ct. at 2038. Thus, both subsections must be read in harmony and consistently. Accordingly, *Freeman*'s reasoning applies here.

¶ 34     In *Freeman*, the court stated that "a settlement-service provider who gives a portion of a charge to another person who has not rendered *any* services in return would violate § 2607(b), even if an express referral arrangement does not exist or cannot be shown." (Emphasis added.) *Id.* at ___, 132 S. Ct. at 2043. Conversely, *Freeman* recognized that "a service provider could avoid [RESPA] liability by providing just a dollar's worth of services in exchange for [a] $1,000 fee" because RESPA is not a price control statute and is not concerned with the "value, amount or quality of services" rendered. *Id.* at ___, 132 S. Ct. at 2044. The court reasoned that if Congress had intended for RESPA to be a price control provision, there would have been no need for Congress to direct HUD to provide, five years after RESPA's enactment, recommendations to Congress regarding whether price controls should be enacted. *Id.* at ___, 132 S. Ct. at 2039 (citing 12 U.S.C. § 2612(a) (1976)).

¶ 35     From this, the only reasonable interpretation of section 2607(b) is that it prohibits fee-splitting with a party where *no* services are provided in return for the fee, which is consistent with RESPA's underlying purpose of preventing the abusive practice of paying a party merely for the referral of business. See *Martinez v. Wells Fargo Home Mortgage, Inc.*, 598 F.3d 549, 553 (9th Cir. 2009) (section 2607(b) "prohibits only the practice of giving or

accepting money where no service whatsoever is performed in exchange for that money"); *Hazewood v. Foundation Financial Group, LLC*, 551 F.3d 1223, 1226 (11th Cir. 2008) (a section 2607(b) violation requires that no services were provided in return for the settlement fee). Consequently, adopting *Freeman*'s rationale, the relevant inquiry is whether *any* service was performed by the attorney agent in return for the fee paid by the title company so that the compensation paid to the attorney agent was not unearned or merely a kickback.

¶ 36    Here, the title companies offered evidence supporting a finding that the attorney agents performed actual title settlement services. The record reveals that after attorney agents received a search package and contemporaneously with or shortly thereafter an A-Exam or Preliminary Commitment, attorney agents still performed services, some of which included: (1) clearing any cloud to the real property's title, *i.e.*, any liens; (2) providing instructions on what to include on title commitments; (3) recommending the waiver of exceptions to title; (4) making changes to the A-Exam or Preliminary Commitment; and (5) attending closings. The record further reveals that a nonattorney agent does not perform the same clearing and waiver services at closing nor is he or she exposed to potential liability associated with the waiver of exceptions. Importantly, the clearing and waiver of exceptions are necessary functions to determine final insurability. Moreover, plaintiffs do not contend that attorney agents under the programs provided no services in exchange for their compensation.

¶ 37    Based on the evidence in the record and in light of the reasoning set forth in *Freeman*, we cannot conclude the trial court's finding that the attorney agent programs satisfied the minimum threshold of requiring an attorney agent to perform actual services relating to the issuance of a title insurance policy was against the manifest weight of the evidence. See *Lane v. Residential Funding Corp.*, 323 F.3d 739, 744 (9th Cir. 2003) (noting that section 2607 prohibits payments that are for the referral of business and nothing else (quoting *Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004, 1013 (9th Cir. 2002))). Consequently, the title companies' payments to attorney agents were not merely kickbacks for the referral of business or unearned fees because the attorney agents performed services to earn the fees. As *Freeman* tells us, RESPA is not concerned with whether the attorney agents were paid too much for their actual services, but asks only whether actual services were rendered. Thus, the title companies' payments were not unlawful under section 2607.

¶ 38    Plaintiffs also assert that the trial court erred in declining to assess the reasonableness of the fee paid to attorney agents in comparison to the amount of services provided relating to the issuance of a title insurance policy. Plaintiffs claim that attorney agents were prohibited from receiving full payment for their services when they only performed a portion of the contracted-for services under the program because they were provided a *pro forma* commitment, which eliminated the need for attorney agents to perform many "core title agent services."

¶ 39    We again turn to *Freeman*, which holds that the reasonableness of the amount paid to a party for services provided is irrelevant to establish a violation of section 2607(b). *Freeman*, 566 U.S. at ___, 132 S. Ct. at 2039. *Freeman* reiterated that RESPA does not address overcharges for services. *Id*. at ___, 132 S. Ct. at 2040. Here, though not framed as a claim that the attorney agents were paid excessive fees, the plaintiffs' claim resonates as an "overpaid" claim because they assert that attorney agents were "overpaid" if they received the full contract payment amount even though they did not provide all of the services that the payment amount was for, *e.g.*, they received 100% of their fee for only performing 20% of

the work. But under *Freeman*, a payment to a party cannot be divided between an earned and unearned portion. *Id*. at \_\_\_, 132 S. Ct. at 2010. Thus, *Freeman* is dispositive and directly refutes plaintiffs' claim.

¶ 40       Ultimately, the relevant consideration under section 2607 is whether a title company paid a fee to another party who did nothing to earn that fee. *Freeman* instructs that we must analyze whether the fee paid by the title company was earned by an attorney agent in that the attorney agent in fact rendered services in exchange for the fee, but the reasonableness of the amount of the fee is irrelevant.[5] Here, as stated, the attorney agents performed services to earn the payments made by the title companies, and we need not consider the reasonableness of the amount paid to the attorney agent under *Freeman*. Moreover, plaintiffs' position that a title company is prohibited from paying attorney agents their full contract amount when they did not provide all required "core title services" essentially advocates for a *per se* violation of RESPA–a position found to be inconsistent with HUD's general resistance to *per se* kickback rules.[6] *Howland*, 672 F.3d at 534. Particularly persuasive is the Seventh Circuit Court of Appeals' decision in *Howland* (*id*. at 535) (a decision issued less than three months before *Freeman*) in which the court expressly stated "we do not read the [Florida Policy Statement] to suggest a per se rule that a title agent who does not qualify under the Section 8(c)(1)(B) safe harbor may not be paid a full contractual title examination fee under Section 8(c)(2)." *Id*. at 534. The *Howland* court ultimately held that RESPA kickback claims premised on unreasonably high compensation for services actually performed were inherently unsuitable for class action treatment. *Id*. at 535.

¶ 41       We are also not persuaded by plaintiffs' position that the Florida Policy Statement should be given deference pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984), which established a two-part test for judicial review of an agency's construction of a statute which it administers. Under the *Chevron* test, a court must first determine whether Congress has directly addressed the precise question at issue. *Id*. If Congress' intent is clear, the inquiry ends and the court and the agency must give effect "to the unambiguously expressed intent of Congress." *Id*. at 842-43. If Congress has not directly addressed the specific issue or the statute is ambiguous, then the court must determine whether the agency's interpretation of the ambiguous provision is based on a permissible construction of the statute. *Id*. at 843. The agency's interpretation of a statutory scheme it is entrusted to administer is given considerable weight, unless it is arbitrary, capricious, or manifestly contrary to the statute. *Id*. at 844.

¶ 42       We note that *Freeman* declined to resolve the issue of whether the later 2001-1 SOP warranted *Chevron* deference, which illustrates that judicial deference to a HUD statement of position is not always warranted. *Freeman*, 566 U.S. at \_\_\_, 132 S. Ct. at 2040. The 2001-1

---

[5]As *Freeman* noted, federal courts have consistently recognized that section 2607(b) "does not reach unreasonably high fees." *Freeman*, 566 U.S. at \_\_\_, 132 S. Ct. at 2040 (citing *Kruse v. Wells Fargo Home Mortgage, Inc.*, 383 F.3d 49, 56 (2d Cir. 2004), *Santiago v. GMAC Mortgage Group, Inc.*, 417 F.3d 384, 387 (3d Cir. 2005), and *Friedman v. Market Street Mortgage Corp.*, 520 F.3d 1289, 1297 (11th Cir. 2008)).

[6]Plaintiffs pled in their complaint that the title companies' performance of "core title services" "necessarily renders all payments to attorney agents through these programs mere kickbacks in violation of Illinois and federal law."

SOP opined that a service provider faces liability under 2607(b) by not only collecting an entirely unearned fee, but also by charging a fee that " 'exceeds the reasonable value of goods, facilities, or services provided.' " *Id*. at ___, 132 S. Ct. at 2039 (quoting 66 Fed. Reg. 53059 (2001)). *Freeman* found that any consideration regarding the "value" of the services provided set forth in 2001-1 SOP resulted in price regulation and that was a palpable overreach going " 'beyond the meaning that the statute can bear.' " *Id*. at ___, 132 S. Ct. at 2040 (quoting *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 229 (1994)).

¶ 43    Plaintiffs continued to maintain during oral argument that the Florida Policy Statement and corresponding regulations must be given deference and *Freeman* is inapplicable because it addressed a different policy statement. Plaintiffs attempt to distinguish *Freeman* mainly on the basis that a different policy statement was considered, but a close analysis of the policy statements–2001-01 SOP and Florida Policy Statement–reveals that the principles in both are consistent. Both HUD interpretations pronounced HUD's position that RESPA was violated where another party received a payment that was not reasonably commensurate with the services provided, *i.e.*, the interpretations require an analysis of the reasonableness of the fees in comparison to the services provided. Compare Florida Policy Statement, 61 Fed. Reg. at 49400 ("agent may receive payment for services actually performed pursuant to section 8(c)(2), so long as the payment is reasonably commensurate with the reduced level of responsibilities assumed by the agent"), with 2001-1 SOP, 66 Fed. Reg. at 53059 (prohibiting a fee "in excess of the reasonable value of goods or facilities provided or the services actually performed"). *Freeman* expressly found this approach to be "manifestly inconsistent with the statute HUD purported to construe" and Congress' intent. *Freeman*, 566 U.S. at ___, 132 S. Ct. at 2039. Consequently, *Freeman*'s rationale precludes affording any deference to the Florida Policy Statement.

¶ 44    Likewise, we believe HUD's regulations regarding the prohibition against kickbacks and unearned fees (24 C.F.R. § 3500.14 (2001)) may be read in harmony with *Freeman* to the extent that they both require an analysis to identify the services the attorney agents provided under the programs. *Freeman*'s reasoning that a party earns the fee paid by a settlement service provider when any service is performed does not contradict the guidance provided in the regulations. But the regulation is now at odds with *Freeman* because the regulation, much like the Florida Policy Statement, requires a comparison of the services performed by the attorney agents in comparison to the fee paid by the title companies to ensure the amount paid bears a "reasonable relationship to the market value of the goods or services provided" (24 C.F.R. 3500.14(g)(2) (2001)) where such a consideration is not relevant under *Freeman*. Notably, the regulation provided HUD with the authority to investigate whether settlement fees were the product of a kickback or an unearned fee split, but it does not vest HUD with the authority to regulate the reasonableness of fees charged. *Id*. Because *Freeman* is clear that RESPA is not a price control statute, the regulation's interpretation of section 2607 to the extent that it requires an analysis of the "value" of the services rendered by attorney agents is no longer authoritative and warrants no deference.

¶ 45    Similarly, section 21 of the Title Act (215 ILCS 155/21(a)(5) (West 2002)) does not provide a basis for giving deference to the Florida Policy Statement over *Freeman*. Section 21 generally permits the suspension, revocation or refusal to grant a certificate of authority, registration or license or the imposition of a fine for violating the Act where a payment was

made in "violation of any State or federal law or regulations or opinion letters issued under the federal Real Estate Settlement Procedures Act of 1974." *Id*. But section 21 does not expressly include HUD statements of policy. Moreover, a claim under the Title Act must be premised on a finding that RESPA (section 2607) was violated, which was not the case here. See 215 ILCS 155/21 (West 2002) (incorporating RESPA). Under *Freeman*'s rationale, payments to attorney agents are not prohibited where actual services were provided relating to the issuance of a title insurance policy. Thus, nothing in section 21 requires a departure from *Freeman*'s holding and rationale or deference to the Florida Policy Statement.

¶ 46    Finally, we find plaintiffs' reliance on this court's prior decision on the issue of class certification as a basis to reverse the trial court's judgment misplaced. Notably, plaintiffs do not dispute that the attorney agents performed actual services relating to the issuance of a title insurance policy. But plaintiffs assert that evaluating whether an attorney agent performed actual work is irrelevant because this court instructed the trial court only to determine whether attorney agents received a *pro forma* commitment as defined by the Florida Policy Statement. Plaintiffs claim that the relevant inquiry on remand was not whether the attorney agents performed *any* work and the trial court was only directed to determine whether the A-Exam and Preliminary Commitment were *pro forma* commitments.

¶ 47    Importantly, this court's prior decision was limited to whether the class should be certified under section 2-801 of the Code of Civil Procedure (735 ILCS 5/2-801 (West 2006)). *Chultem*, 401 Ill. App. 3d at 235. This court determined that the questions of whether *pro forma* commitments were given to attorney agents and if it was illegal to pay the full contract rate when *pro forma* commitments were provided (rendering the safe harbor provisions of sections 8(c)(1)(B) and 8(c)(2) inapplicable) were questions common to the class that predominated over any individual questions eliminating the need for a transaction-by-transaction analysis. *Id*. at 236. Although it is true that we deemed it necessary to determine whether the attorney agents received *pro forma* commitments, the context of that determination was limited to identifying whether there was an issue common to the class that predominated over individual issues. This court expressly declined to address the merits of the underlying actions and limited our analysis to examining the "propriety of class certification." *Id*. at 237. More importantly, this court's decision was issued before *Freeman*, which as noted, supports the proposition that the actual work performed by attorney agents under the programs is a relevant consideration under section 2607 because, if any services were performed, the attorney agents were not paid an unearned fee for the referral of title insurance business.

¶ 48    We are also not persuaded by plaintiffs' claim that the law of the case precludes an analysis of the work performed by attorney agents under the program on the basis that this court previously resolved the issue. In our prior decision, we stated that "[t]he allegations in plaintiffs' complaint, *taken as true for purposes of determining class certification*, are that Ticor's A-exam and CTI's preliminary commitment are '*pro forma* commitments' and, as such, any attorney agent would not be providing 'core title services' for the payments to come within the section 8(c)(1)(B) exemption." (Emphasis added.) *Id*. at 235. Thus, this court *assumed* the allegations to be true for purposes of deciding the procedural matter of whether the class should be certified. See *Howland*, 672 F.3d at 534 n.3 ("*Chultem* merely assumed (without evidence) that the plaintiffs could prove that a payment of the full contract rate would violate RESPA."). Again, the context of our prior decision was to determine the

limited issue of whether litigation should proceed as a class action–an issue distinct from resolving any claim on its merits.

¶ 49    Our decision in *Aguilar v. Safeway Insurance Co.*, 221 Ill. App. 3d 1095 (1991), is dispositive. In *Aguilar*, our prior decision on appeal reversed a section 2-615 dismissal of a complaint (Ill. Rev. Stat. 1989, ch. 110, ¶ 2-615), finding that the complaint stated a cause of action and remanding with directions that the complaint be reinstated. *Aguilar*, 221 Ill. App. 3d at 1099. The plaintiffs in their second appeal claimed that our first decision precluded the defendants on remand from raising affirmative defenses because doing so was contrary to this court's prior ruling. *Id.* at 1098. Plaintiffs asserted that the trial court's only function was to reach a determination of damages to be assessed against each defendant. *Id.* at 1100. But this court's mandate did not direct that on remand the proceedings should be limited to proof of damages; the trial court was merely directed to reinstate the complaint. *Id.* at 1099. In the second appeal, we rejected the plaintiffs' claim and held that the prior appeal "did not purport to enter judgment, and beyond directing the reinstatement of plaintiffs' complaint, the court did not limit further proceedings in any way. The filing of an answer and affirmative defenses is fully consistent with the mandate of this court to reinstate the complaint and proceed with the litigation." *Id.* at 1101.

¶ 50    Similarly here, our prior decision directed the trial court to certify the class and continue litigation. See *Chultem*, 401 Ill. App. 3d at 238 ("As plaintiffs have met all the requirements of section 2-801, including the predominance requirement, we reverse and remand with instructions the circuit court certify these cases as class actions."). Contrary to plaintiffs' positions, nothing in our prior decision purported to: (1) determine the title companies' liability; (2) find that plaintiffs had established a violation of RESPA; or (3) limit the issue on remand to only address damages. The only direction to the trial court was to certify the class–which the trial court followed on remand.

¶ 51    Plaintiffs' prior appeal was limited to reviewing a procedural issue, *i.e.*, whether they met the statutory requirements for class certification. See *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 236 (2005) (reiterating that " '[a] class action is a potent procedural vehicle' " (quoting *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 334-35 (1977))); *Weiss v. Waterhouse Securities, Inc.*, 208 Ill. 2d 439, 449-50 (2004) ("a class action complaint should be dismissed at the pleading stage if the complaint fails to meet the statutory requirements for class certification" (internal quotation marks omitted)). Because this court did not address matters concerning the merits of plaintiffs' substantive claims, the law of the case doctrine is inapplicable here and the trial court properly considered the merits of plaintiffs' class action complaint on remand. See *Aguilar*, 221 Ill. App. 3d at 1101 (" 'Although questions of law actually decided in a previous appeal are binding, matters concerning the merits of a controversy which were not decided by the appellate court do not become the law of the case.' " (quoting *Huber v. Seaton*, 186 Ill. App. 3d 503, 505 (1989), citing *Zokoych v. Spalding*, 84 Ill. App. 3d 661, 667 (1980))).

¶ 52    Likewise, we are not persuaded by plaintiffs' claim that the trial court's judgment cannot be reconciled with its prior summary judgment ruling. In both rulings, the trial court determined that the relevant inquiry was whether an attorney agent provided actual, necessary and distinct services. The trial court's ruling after trial was based on resolution of that issue after consideration of the evidence. But even if there was an inconsistency between the order denying summary judgment and the court's ruling after trial, it would not warrant

reversal because an order denying summary judgment is an interlocutory order and nothing precluded the trial court from modifying or vacating that interlocutory order before final judgment. See *Hernandez v. Pritikin*, 2012 IL 113054, ¶ 42 ("[T]his court has repeatedly held that the circuit court has the inherent power to modify or vacate an interlocutory order granting summary judgment any time before final judgment."). In any event, plaintiffs' claim that they were somehow prejudiced by the claimed inconsistency is belied by the fact that following class counsel's complaint on this point, the trial court offered plaintiffs the opportunity to submit any additional evidence they felt was necessary–an offer which was declined. Under these circumstances, counsel cannot complain that they were misled about the issues to be resolved at trial.

¶ 53    In sum, applying *Freeman*'s rationale to the facts of this case, we conclude that plaintiffs failed to establish a violation of RESPA because the attorney agents provided services to earn their payment from the title companies. *Freeman* holds that the reasonableness of the amount paid to the attorney agents is irrelevant. Because *Freeman* now interprets section 2607, we are no longer at liberty to give deference to the Florida Policy Statement and the related regulations addressing the issues presented in this appeal, which are inconsistent with *Freeman*. Consequently, the trial court did not err in entering judgment in favor of the title companies. As such, we need not address the alternative grounds the title companies raise as a basis to affirm the trial court's judgment, which include: (1) their good faith compliance with RESPA; (2) state regulators authorized attorney agents to participate in the programs; (3) plaintiffs suffered no actual damages; (4) plaintiffs failed to prove proximate cause; and (5) plaintiffs cannot demonstrate a need for injunctive relief.

¶ 54                                      Cross-Appeal

¶ 55    The title companies' cross-appeal addresses whether the trial court erred in certifying the class and then refusing to decertify the class. The title companies assert that disposition of their cross-appeal is contingent on and must be decided only if we reverse the trial court's ruling in their favor. Because we find no error in the trial court's ruling in favor of the title companies, we need not address the title companies' cross-appeal.

¶ 56                                      CONCLUSION

¶ 57    We affirm the trial court's ruling that the title companies' payments to attorney agents were not prohibited under section 2607 where attorney agents provided settlement services in return for the payment and the reasonableness of the monetary amount of those payments is irrelevant. Consequently, plaintiffs failed to establish a violation of the Title Act (215 ILCS 155/1 (West 2002)) and Consumer Fraud Act (815 ILCS 505/1 (West 2002)), claims which are both premised on a violation of section 2607.

¶ 58    Affirmed.

¶ 59    JUSTICE PUCINSKI, dissenting.

¶ 60    With great respect to my colleagues and to the trial judge, I dissent.

¶ 61    When this case first came to the Appellate Court in *Chultem v. Ticor Title Insurance Co.*, 401 Ill. App. 3d 226 (2010) (*Chultem I*), our colleagues remanded to the trial court to certify

a class and stated: "if the plaintiffs are able to prove at trial Ticor's A-exam and CTI's preliminary commitments are '*pro forma* commitments' and defendants cannot lawfully send their attorney agents *pro forma* commitments and pay them full compensation, they will prevail on their individual claims and will have established a right to recovery for all class members regardless of the services performed by said attorney agents." *Id.* at 236. In *Chultem I*, our colleagues specifically found that the "trier of fact will not have to make a transaction-by-transaction review of whether the attorney agents performed core title services pursuant to the section 8(c)(1)(B) exemption." (Emphasis omitted.) *Id.*

¶ 62    Yet, after agreeing that if, in fact, the title companies were sending *pro forma* commitments to their title agent/attorneys, the title companies could not legally pay them the full amount of their contract, the trial court then went on and did exactly what it should not have done, *i.e.*, it held a trial on what the attorneys did and *not* on whether the documents sent met the definition of *pro forma* commitments.

¶ 63    Our colleagues in *Chultem I* based their decision on a reading of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. § 2607 (2000)). They noted that "RESPA sections 8(a) and (b) prohibit persons from giving or receiving kickbacks for the referral of title insurance business and from giving or receiving a portion of any title insurance premium 'other than for services actually performed.' 12 U.S.C. §§ 2607 (a), (b) (2000)." *Chultem I*, 401 Ill. App. 3d at 227.

¶ 64    In order to figure out what Congress meant by those sections, our colleagues gave *Chevron* deference to and relied on the regulations promulgated by HUD:

> " '[F]or an attorney of the buyer or seller to receive compensation as a title agent, the attorney must perform core title agent services (for which liability arises) separate from attorney services, including the evaluation of the title search to determine the insurability of the title, the clearance of underwriting objections, the actual issues of the policy or policies on behalf of the title insurance company, and, where customary, issuance of the title commitment, and the conduction of the title search and closing.' " *Id.* at 228 (quoting 24 C.F.R. § 3500.14(g)(3) (2001)).

¶ 65    Our colleagues also relied on the RESPA Statement of Policy 1996-4, later issued in the Federal Register (61 Fed. Reg. 49398, 49400 (Sept. 19, 1996)):

> "[I]f the title insurance company provides its title insurance agent with a pro forma commitment, *** the tile insurance agent is not 'actually performing' these services. As such, the title insurance agent would not be providing 'core title services' for the payments to come within the section 8(c)(1)(B) exemption." (Internal quotation marks omitted.) *Chultem I*, 401 Ill. App. 3d at 228.

¶ 66    Finally, our colleagues relied on the RESPA Statement of Policy 1996-4 (61 Fed. Reg. 49399 (Sept. 19, 1996)), which defines "*pro forma* commitment" as:

> "[A] document that contains a determination of the insurability of the title upon which a title insurance commitment or policy may be based and that contains essentially the information stated in Schedule A and B of a title insurance commitment (and may legally constitute a commitment when countersigned buy an authorized representative). A pro forma commitment is a document that contains determinations or conclusions that are the product of legal or underwriting judgment regarding the operation or effect of the various documents or instruments or how they

- 17 -

affect the title, or what matters constitute defects in title, or how the defects can be removed, or instructions concerning what items to include and/or to exclude in any title commitment or policy to be issued on behalf of the underwriter." (Internal quotation marks omitted.) *Chultem I*, 401 Ill. App. 3d at 228-29.

¶ 67　　The Florida Policy of HUD with respect to RESPA kickbacks and *pro forma* commitments became federal regulations in 1996. (The same regulations were later reissued by the Bureau of Consumer and Financial Protection.) Our colleagues in *Chultem I* relied on those federal regulations in assessing the issues in the original appeal. I believe this demonstrates that this court has already given *Chevron* deference to the regulations. And, in fact, the trial court did as well when it accepted the definition of *pro forma* commitments.

¶ 68　　What the trial court did not do is compare Ticor A-exam and CTI's preliminary commitments to the definition of *pro forma* commitments. This relatively simple document comparing exercise would have answered the question posed in *Chultem I* and resolved this case.

¶ 69　　A *pro forma* commitment, taking one part at a time, is:

(1) a document that contains a determination of the insurability of the title upon which a title insurance commitment or policy may be based. CTI employees used underwriting judgment and made the preliminary decision about insurability by analyzing starter files to determine exceptions; whether to use the legal description of the previous policy; what exceptions and tax exceptions to raise; and if there were any liens, mortgages, or judgments which might affect the property that still needed to be released. Ticor employees did the data entry; got information about the property from their files; analyzed starter files to determine what exceptions to bring forward and what standard exceptions and tax exceptions to raise and if there were any mortgages, liens, or judgments affecting the property that still needed to be released. These activities determined the insurability of the title; and

(2) that contains essentially the information stated in Schedule A and B of the title insurance commitment. Both CTI and Ticor's documents contained all the information essentially stated in Schedule A and B of the title insurance commitment; and

(3) may legally constitute a commitment when countersigned buy an authorized representative. Both CTI and Ticor actually issued the owner's title policy and the loan title policy *after* the closing. The CTI policies and the Ticor policies did not rely on the title agent/attorney's signature, since the title agent/attorneys had no unilateral authority to agree to any waivers; and

(4) a document that contains determinations of conclusions that are the product of legal or underwriting judgment regarding the operation of effect of the various documents or instruments or how they affect the title. Both CTI and Ticor preliminary commitments contained all of the conclusions and legal or underwriting judgment that would affect title. In fact, the CTI preliminary commitment was the only title commitment issued in the transaction and Ticor printed the title commitment three days before the title agent/attorney returned his A-Exam; or

(5) what matters constitute defects in title. This work was done in all cases by the employees of the title company; or

(6) how the defects can be removed. This work was done in all cases by the employees of the title company; or

(7) instructions concerning what items to include and/or to exclude in any title commitment or policy to be issued on behalf of the underwriter. This work was all done by employees of the title company. (Definition of *pro forma* commitment see: RESPA Statement of Policy 1996-4, 61 Fed. Reg. 49399 (eff. Sept. 19, 1996).)

See *Chultem I*, 401 Ill. App. 3d at 228-29 (quoting RESPA Statement of Policy 1996-4, 61 Fed. Reg. 49399 (eff. Sept. 19, 1996)).

¶ 70    It is clear that the title agent/attorneys did not have the unilateral authority to waive anything, that their signatures were totally duplicative because the title company had already decided to issue the title commitment by providing the A-Exam and the preliminary commitment and the actual title policy was not finally issued until *after* the closing by the title company, not at the closing as my colleagues believe. That is because the bundle of papers put together at the closing were then sent to the title company by the client's attorney–which would have been done by any attorney representing either the buyer or seller–and then the title company adds certain information–including the new bank and mortgage information–to its computer data system and issues the final owner's and loan policies.

¶ 71    My colleagues argue against *Chevron* deference, apparently believing that Congress was crystal clear and unambiguous in its language and intent. Okay, let us test that theory.

¶ 72    If the language and intent are crystal clear then the words Congress used in RESPA: to protect consumers "from unnecessarily high settlement charges caused by certain abusive practices" (12 U.S.C. § 2601(a) (2012)) and the intent expressed in section 2601(b)(2), *i.e.*, "the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services" (12 U.S.C. § 2601(b)(2) (2012)) must defeat the defendant's position that these shell games were permissible.

¶ 73    Congress wanted to stop any practice among title companies which gouged clients by adding unnecessary costs for title policies. Title companies were competing for business. So they developed several creative business models to get more referrals. One of these was by lining up attorneys as title agents who would make referrals of business. These were clearly the kickbacks for referrals that Congress wanted to stop. Now, *Freeman* tells us that RESPA is not a price fixing law, and so, *overcharges* are permitted. However, the intent of Congress to prevent unnecessary *add-ons* is something different. The two can be reconciled by looking at the language and what was actually happening. These title agent/attorneys were getting rewarded with kickbacks for their referrals–since they only referred title business to the respective title companies by getting no work contracts with the title companies. It was simply a windfall for the title attorney/agents. The add-ons to attorney agents are exactly the kinds of kickbacks for referrals that Congress intended to stop, specifically because the attorney agents were not necessary for the title company to do its work since the title company already did all the work and prepared the *pro forma* commitment. The money to the attorney was not an overcharge; it was an add-on for a totally superfluous, duplicative and unnecessary line item.

¶ 74    On the other hand, if the language and intent of Congress are less than clear, *i.e.*, ambiguous, then *Chevron* deference to the HUD regulations is permitted, and then the definition of *pro forma* commitments, which was adopted in *Chultem I* and the trial court,

and the language prohibiting payments to an attorney/agent who has received a *pro forma* commitment must be accepted and the majority's analysis must still fail.

¶ 75 And, I note that the trial judge did in fact give deference to the regulations when she determined that the commitments being sent to the title agent/attorneys were not *pro forma* commitments, a determination she made, not by comparing the commitment documents the title companies sent to its title agent/attorneys with the definition of *pro forma* commitments, but by permitting the defendants to develop what work title agent/attorneys performed. As our colleagues in *Chultem I* correctly pointed out, if there were *pro forma* commitments being sent to the title agents/attorneys, then no further inquiry was necessary because by definition there was no additional title work to be done by the title agent/attorneys.

¶ 76 In fact, Congress was very specific that it left to HUD the job of writing the rules and regulations by authorizing HUD "to prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of" RESPA. 12 U.S.C. § 2617(a) (2012).

¶ 77 My colleagues here rely on *Freeman* to dismiss the regulations. But *Freeman* answered an entirely different question–whether there could be a split of charges when only one entity or person is involved–and looked at an entirely different regulation (*i.e.*, 66 Fed. Reg. 53057 (Oct. 17, 2001)), in which HUD ruled that it was not limited to situations in where there were at least two persons splitting an unearned fee, that is in yield spread premiums. The *Freeman* court determined that, in fact, there has to be more than one person or entity splitting a fee for it to be split.

¶ 78 The question here is whether the title company may add on a fee for a title agent/attorney who receives a *pro forma* commitment. There are two entities and there is an extra add-on. We know that because the title companies billed the clients for title services at say $1,000, but only kept $200 to $500 of it. The extra went to the title agent/attorney as an add-on, disguised as a payment for services. (And, I note, it was not disclosed to the client.) But, round and round it goes: if the *pro forma* commitment left no title services to perform, then the title agent/attorney who received a *pro forma* commitment could not, by definition, be performing any title services. This is covered by 61 Fed. Reg. 49399 (Sept. 19, 1996).

¶ 79 These were plain and simple kickbacks for referrals, and no matter how you dress them up, they are still kickbacks; they are still wrong and the class can demonstrate violations of both the federal and Illinois laws.

¶ 80 These plaintiffs have appropriately narrowed the class. I would reverse and remand.